**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALMEIDA BUS LINES, INC., Respondent.**

**No. 6260.**

United States Court of Appeals
First Circuit.
June 25, 1964.

Vivian Asplund, Attorney, Washington, D. C., with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Warren M. Davison, Washington, D. C., Attorney, were on brief, for petitioner.

Joseph C. Wells, Washington, D. C., with whom Reilly & Wells, Washington, D. C., was on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued against respondent on December 26, 1962, following the usual proceedings under the Act. The Board, in adopting the opinion of its trial examiner, found respondent to have discriminated with respect to the hire and tenure of two of its employees in violation of Section 8(a) (3) of the Act and to have violated Section 8(a) (1) by interfering

with, restraining and coercing its employees in the exercise of their statutory rights.

Respondent, a Massachusetts corporation with its principal office and terminal in New Bedford, is engaged in providing bus transportation to the public on runs set up by the Massachusetts Department of Public Utilities. In the latter part of 1961, the Union [1] instituted an organizing campaign among respondent's employees. This campaign culminated in a Board conducted election on October 27, 1961, which was won by the Union. On January 18, 1962, the Union filed unfair labor practice charges against respondent which were supplemented by amended charges filed on March 16 and April 23, 1962. On March 22, 1962, an original charge against respondent was filed by one Gilbert Jesus, a former employee. The cases were consolidated for hearing.

The Section 8(a) (3) violation concerned the firing of one Joseph Olivera, and the alleged firing of Jesus. We will consider Olivera's case first. Olivera had worked as a bus driver for respondent since 1955. Respondent was aware of his union leadership and activity. He was the Union's observer at the October election and was elected president of the local in November, 1961. On December 12, 1961, Olivera's bus was involved in an accident resulting in substantial damage to the vehicle. It does not appear from the record whether or not Olivera was at fault. Immediately following the accident, he called the terminal, told what had happened and requested that another coach be sent out for the passengers. When none arrived, he called again and spoke to John Almeida, Jr., respondent's principal stockholder and husband of Mrs. Almeida, respondent's president and operating manager. Almeida was very upset and told Olivera "I've sent an inspector out, and I'm going to get to the bottom of this."

█ Olivera continued driving for three days. On Saturday, December 16,

he was in respondent's office and was told by Mrs. Almeida that he had neglected to make out an accident report. He immediately completed one, whereupon Mrs. Almeida paid him his wages for the prior week and told him not to return to work until he had spoken to her again the following Monday. On Monday, in a telephone conversation, Olivera asked Mrs. Almeida if he was going back to work. She said "No." He asked if she was firing him. She replied that she was sorry but would have to let him go. He asked why and she replied "Well, you've had too many accidents." Olivera then commented "Come Mrs. Almeida you know that you are firing me because I'm president of the union." She answered, "Well, you fellows want it that way, and that's the way its going to be; you want to live by your rules, and I've got rules of my own to live by." Further testimony at the hearing elicited the fact that Olivera had been involved in seven accidents prior to the one on December 12.

█ This is not the substantial evidence on the record considered as a whole necessary to support the Board's decision. National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). The reason given Olivera for his discharge was that he had "too many accidents" and that is not an unreasonable characterization of someone involved in eight accidents within a four years time span. It may be that none of the accidents were due to any fault on his part. But it is not for the Board to determine whether or not an employer's business judgment was too harsh under the circumstances. Rather, the burden is on the Board to show that an improper motive dictated the employer's decision to fire its employee and absent such a showing, the employer's right to make such a decision must be respected. N.L.R.B. v. United Parcel Service, Inc., 317 F.2d 912 (1st. Cir. 1963); National Labor Rel. Bd. v. Houston Chronicle Pub. Co., 211 F.2d 848-

1. Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, AFL-CIO.

(5th Cir. 1954). This the Board has failed to do. One of the first incidents from which the trial examiner inferred an improper motive was absence of any management official to testify as to why Olivera was fired. Such testimony was not necessary since Olivera himself stated the reason given was his number of accidents—which were certainly more than the "few" ascribed to him by the examiner. The examiner reported Joseph Almeida, III, respondent's general manager and the son of its owner, as admitting that many bus drivers were still operating who had filed many accident reports in the past. All that Almeida actually said was that he had "seen the forms filed in the office on many occasions" and that he had "seen many of them make the reports." Mrs. Almeida's response to Olivera that "you want to live by your rules, and I've got rules of my own" was taken by the trial examiner to support his conclusion that Olivera's discharge was a discriminatory device. This was reading too much into an ambiguous statement which could more accurately reflect the thought that under the rules of the company an employee is discharged if involved in too many accidents. A conversation Olivera had with Almeida, III, concerning the Union, mentioned by the examiner, could not be considered coercive and ended with Almeida's statement that "I'm not going to tell you how to vote." In sum, one is left with the impression that the examiner improperly inferred employer discrimination merely because of Olivera's membership and active participation of the union. National Labor Relations Board v. Citizen-News Co., 134 F.2d 970 (9th Cir. 1943).

The case of Jesus stands on a different footing. Jesus worked as a regular driver for respondent from 1952 until 1954 when he left voluntarily. He returned to work for respondent in the fall of 1960 as a garage employee and extra driver but quit again in May 1961 in pique because of his continual relegation to garage duty while other part-time men were assigned bus runs at higher pay. In September 1961 he was called by Joseph Florio, respondent's dispatcher, and asked if he would take the "dog race run" several nights a week. Florio testified that prior to this call, Jesus had come to the terminal and inquired of the possibility of his driving one of respondent's Labor Day charter buses to Ludlow and that Mrs. Almeida told Florio to "put him to work until there is an opening in the garage; when there's an opening, we'll give him an opening permanently in the garage." Florio claimed that Jesus was made aware of this arrangement and drove the chartered bus Saturday and Sunday. Jesus denied being hired under such a condition. On Monday he began the dog track run, working two to four times a week as a spare driver on the run and also accepting extra and charter runs. He worked only one night in the garage during this period at which time he noticed that the usual garage worker was out driving a bus: "So I told [Florio] I didn't like that and I didn't want it to happen again; I didn't want to work in the garage." A few nights later Florio again needed help in the garage and called Jesus who turned down the offer. "So I didn't call him any more when there was any extra work to do because he didn't want it." Nevertheless, Jesus continued on the dog track run until October 25, 1961, two days prior to the election.

On October 26, Jesus was called to the home of Almeida, III, the son of Mrs. Almeida, and asked "to go for a ride" with him. During the ride Almeida referred to the election the next day and said, "if you fellows go along with the union you're not going to get no more work, but if you go along with the company and help us out, well, I'll give you all I can." Almeida did not deny making this statement but contended that he did it on his own and without the knowledge of his mother.

It is undisputed that following his participation in the election Jesus was offered no more work by respondent, save a charter trip to Connecticut in November, 1961 after he had recommended respondent's services to the charterer and a

charter trip to Indiana in the Spring of 1962, a few weeks prior to the labor board hearing. On the day following the election, Jesus testified he asked Florio for the reason why no run was assigned to him and Florio's response was "Well, Johnny [Almeida, III] told me to tell you right now there's nothing doing." Jesus continued to go to the terminal but no jobs were assigned to him. In April, 1962 he discovered that the unemployment compensation people had been informed by respondent that he had quit his job. He went to see respondent about this and while there asked Florio "how come you fellows lay me off and then I go down to Security and you mess me up down there, and you guys are putting guys on the runs?" He testified that Florio replied "Well, Johnny told me not to give you any more work because of this union baloney." Florio denied making the statements attributed to him. He claimed that the dog track run ended in late October and following that there was no more work for Jesus insofar as he refused to work in the garage. It appears, however, that at least two new drivers were hired in December, 1961 and Florio admitted that several new drivers were hired commencing in the fall of that year. Upon these facts the trial examiner found that respondent had "discriminatorily refused to give regular work as a bus driver to Jesus in order to discourage union membership and activity." [2]

There is evidence in this record indicating that valid business reasons may have dictated respondent's failure to offer employee Jesus further driving assignments after the election. A slow down in business in the months following the close of the dog track season in late October, together with the fact that Jesus had refused work in the garage (and the evidence showed respondent generally in need of garage help) may have served to convince respondent that other drivers should be given the bus runs instead. But "[c]onduct which on its face appears to serve legitimate business ends

* * * is wholly impeached by the showing of an intent to encroach upon protected rights. The employer's claim of legitimacy is totally dispelled." National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963). And where the Board failed to disclose an improper motive with regard to the discharge of Olivera, it has succeeded in the case of Gilbert Jesus.

Almeida, III admitted that he had talked to Jesus about the union but contended that it was an independent act, done without the knowledge of his mother and by one who was but a "clerk" in the company. This "clerk", however, was the son of the owner, a director of respondent's charter service and listed as "General Manager" on respondent's time tables. The employees who testified at the hearing, when questioned on the subject, stated that they believed him to be the manager. At times he directed Florio as to whom to assign to the various runs. He was thus in a position to make good his threat that unless Jesus went along with the company he would get "no more work." Jesus' testimony concerning Florio's discriminatory statements, which reflected Almeida, III's determination to follow through on his threat, was denied by Florio and raised an issue of credibility which was resolved by the examiner in Jesus' favor. The Board's acceptance of the examiner's disbelief in Florio's testimony, based on his observance of the witness while testifying in general was not "incredible on its face." N.L.R.B. v. C. Malone Trucking, Inc., 278 F.2d 92, 95 (1st Cir. 1960). It is true that Jesus was not a union protagonist nor is there any evidence that he favored the union. It is also true that he alone was denied work after voting in the election. Yet he was distinctly warned by the second in command of his employer that if he went along with the union he would receive no further work, and this threat proved to be very accurate. Faced with the conflicting explanations put

2. The Board recognized that Jesus was only a "spare driver" and revised the examiner's recommended order accordingly.

forward by respondent and the General Counsel, each of which was contended to be the true reason for the denial of work, the examiner had to determine which one actually motivated the discharge. Such a decision is often a difficult one to make since a single situation often presents a complex of motives none of which is clearly identifiable as predominant. However, what we said in N.L.R.B. v. Corning Glass Works, 293 F.2d 784, 786 (1st Cir. 1961) is applicable here:

"We agree with the principle underlying [National Labor Rel. Bd. v.] Chronicle Publishing Co. [230 F. 2d 543 (7th Cir. 1956)] that where an employer's conduct admits of a number of inferences, the Board must ascertain his true motive. The effect of his conduct is not dependent upon the particular inference drawn by the employee. But this does not mean that an employer can not be held for natural consequences of unambiguous statements. *The Board was justified in accepting respondent's announced reason at its face value.*" (Emphasis supplied.)

■ The order pertaining to Jesus, as modified by the Board, will be enforced. The order pertaining to Olivera is denied enforcement. The instances of Section 8(a) (1) violations cited by the Board are not all supported in law and only two are clearly violative of the Act and will be granted enforcement. The threat made to Jesus by Almeida III is one, N.L.R.B. v. Prince Macaroni Manufacturing Co., 329 F.2d 803 (1st Cir. 1964), and the second is Almeida, Jr.'s warning to employee LaFlamme shortly before the employees went out on strike in April, 1962 that if he went out on strike he had "better look for another job." Editorial "El Imparcial," Inc. v. N.L.R.B., 278 F.2d 184 (1st Cir. 1960); see National Labor Relations Board v. Erie Resistor Corp., supra. We return the case to the Board but shall retain our jurisdiction so as to grant prompt enforcement of a revised order consistent with this opinion.