**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALMEIDA BUS LINES, INC., Respondent.**

**No. 6261.**

United States Court of Appeals First Circuit.

June 25, 1964.

Vivian Asplund, Attorney, Washington, D. C., with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Warren M. Davison, Attorney, Washington, D. C., were on brief, for petitioner.

Joseph C. Wells, Washington, D. C., with whom Winthrop A. Johns and Reilly & Wells, Washington, D. C., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order of May 3, 1963, against respondent, finding respondent to have re-

fused to bargain in good faith with the Union [1] in violation of Section 8(a) (5) and (1) of the Act. The Board found that the strike of respondent's employees, which began on April 27, 1962, was caused by respondent's unfair labor practices and ordered respondent to offer reinstatement to the strikers.

Respondent, a Massachusetts corporation with its principal office and terminal in New Bedford, is engaged in providing transportation by bus to the public on runs set up by the Massachusetts Department of Public Utilities. In the latter part of 1961 the Union instituted an original campaign among respondent's previously unorganized employees. The Board election held on October 27, 1961 was won by the Union and it received certification as the exclusive bargaining representative of the employees.[2]

Following certification, respondent and the Union met on ten occasions between January and May, 1962. At these negotiating sessions, respondent was represented by its local attorney, James Waldron, and the Union by its International vice-president, Frederick Fitzgerald. The negotiations ended in a total deadlock and the Board concluded that the failure of the parties to reach agreement was due to respondent's failure to bargain in good faith.

The statutory duty to bargain collectively as set forth in Section 8(d) of the Act imposes upon the parties the obligation "to meet * * * and confer in good faith with respect to wages, hours and other terms and conditions of employment" with a view to the final negotiation and execution of an agreement. The statute states specifically that this obligation "does not compel either party to agree to a proposal or require the making of a concession." Thus the adamant insistence on a bargaining position is not necessarily a refusal to bargain in good faith. National Labor Relations Board v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). "If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may be both the right of the citizen and essential to our economic legal system * * * of free collective bargaining." N. L. R. B. v. Herman Sausage Co., 275 F.2d 229, 231 (5th Cir. 1960). The determination as to whether negotiations which have ended in stalemate were held in the spirit demanded by the statute is a question of fact which can only be answered by a consideration of all the "subtle and elusive factors" that, viewed as a whole, create a true picture of whether or not a negotiator has entered into discussion with a fair mind and a sincere purpose to find a basis of agreement. N. L. R. B. v. Herman Sausage Co., supra; National Labor Relations Bd. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir. 1953). Individual acts or statements of a negotiating party which appear contrary to the required attitude cannot be drawn upon to dilute a finding of good faith where the totality of the party's conduct conforms to the dictates of the statute.

This having been said, an examination of the conduct of the negotiations fails to convince us that respondent has engaged in bad faith bargaining of which it has been found guilty. In the first place, we recognize the existence of a cool atmosphere between respondent and its opposite number across the bargaining table. The company did not want this union and over a period of years had been successful in keeping it out. It could not be expected that after the Union had finally won the battle it would be wel-

1. Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, AFL-CIO.

2. Another phase of the Union's dispute with respondent, No. 6260, was argued along with, but independently of, the present appeal and has been dealt with in a separate opinion, 333 F.2d 725.

comed in with open arms. On its part, the Union, quite naturally, was determined to bring respondent into line with the other bus companies with which it had collective bargaining agreements. Respondent's employees were lacking the advantages and protections afforded other employees covered by union contracts and the stage was set for some hard bargaining.

The first two meetings were held on January 5 and 17 and were devoted almost exclusively to Fitzgerald's attempt to have Joseph Olivera, the local's president, reinstated after having been discharged because of his accident record. A copy of the proposed union contract was given Waldron on the 5th to discuss with Mrs. Almeida, respondent's president and operating head. On the 17th Waldron reported to Fitzgerald that upon reading the Union's proposals, Mrs. Almeida had "hit the fan," a portent of the bargaining to come.

The meeting of February 9 saw the first thorough discussion of the Union's proposals. Here the Union took a position from which it did not waiver: any contract entered into with respondent must include provisions for union security, dues check-off, arbitration and job selection on the basis of seniority. Respondent was equally adamant that it would accept none of the four "must" proposals. Waldron stated that Mrs. Almeida wished to leave the question of whether or not to join the Union up to the individual employee. As for arbitration, Mrs. Almeida did not want an outsider running her business through the means of an arbitration decision. Instead, she or her representative would be willing to meet a Union representative and discuss any situation that might occur within her working rank. For its own and the public's interest respondent felt that it should be the judge of which operator would drive a particular run rather than have operator selection on the basis of seniority. Union dues, respondent suggested, could be collected by a union representative.

Agreements were reached on certain provisions as proposed by the Union and these included the recognition clause, barring of lockouts and strikes, leaves of absences, establishment of a time limit on company charges and union grievances, written notice specifying the cause for suspension or discharge and payment of a minimum of eight hours daily to drivers on regularly scheduled runs. After certain changes suggested by Mrs. Almeida were accepted, agreement was also reached as to probationary period for new employees, a time allowance for operators to report and turn in receipts, wash-up time for mechanics, and reimbursement for operators' use of private cars in going to emergencies. We are not as ready as the Board to characterize these agreements as "minor," and we note the difference from the fact situation present in N. L. R. B. v. Reed & Prince Mfg. Co., supra, where the company's refusal to agree on any union proposal was virtually complete. Nor, for that matter, is there apparent in this record the hypocrisy on the part of the company that was so evident in Reed & Prince.

In addition to rejecting the Union's four "must" proposals, respondent refused to grant any paid holidays, provide uniforms or provide a health and life insurance program. Contending the Almeida Bus Lines, Inc. was not in the charter business, it refused to discuss any contract provision concerning charter work. Counter offers made by Waldron with respect to overtime, seniority in layoffs and re-hiring, length of work day, vacations, duration of the contract, and grievance procedure were not accepted by the Union and remained subject to further negotiation.

With respect to the matter of wages, Waldron stated that he was authorized to offer a wage increase of three cents per hour across the board. The Union had sought an increase ranging from twenty-five cents an hour up to, in certain cases, seventy-five cents an hour spread over the term of the contract. Fitzgerald characterized the three cents

offer to Waldron as "not only an insult to my intelligence but an insult to your intelligence." He said he thought respondent was using Waldron "for an errand boy." As a counter offer, Fitzgerald offered to settle for the same contract he had negotiated with Peter Pan Bus Lines, Inc. of Springfield which contained a lower wage scale than that in the Union's present proposals. He promised to furnish Waldron with a copy of the agreement.

The parties met again on March 1 for about six hours and the existence of a deadlock became apparent. Neither side retreated from its previous position save that on wages. Waldron stated that he was authorized to increase the offer by two cents, making it a five cent per hour increase across-the-board. Fitzgerald refused this offer and stated his belief that respondent was not bargaining in good faith. He gave Waldron a copy of the Peter Pan contract which Waldron promised to look over.

On the same day, March 1, following Fitzgerald's report on the progress of the negotiations, the Union again voted to go out on strike. They had previously so voted following the discharge of Olivera the past December but at his request had put off the actual strike. The next day Fitzgerald notified the federal and state counciliation services about the dispute and all further meetings were arranged by the conciliators, except one meeting held on May 27 or 28 in the Mayor's office at City Hall in which the Mayor's attempt to bring the parties to terms proved unsuccessful.

The meetings held on April 13, 18 and 25 accomplished very little and displayed continued intransigence on the question of the four "must" provisions. On the 13th Waldron reported Mrs. Almeida's rejection of the Peter Pan contract because it provided for a union shop, arbitration, check-off and job selection. Fitzgerald more or less admitted that the Peter Pan contract was a tactic rather than a concession for its terms did not differ greatly from what the Union was asking and he testified that he agreed to settle for that contract because were it accepted he would have had his "must" provisions. On the 18th respondent displayed a new flexibility, Waldron stating that he was "willing to bend more on wages if there is some bending on the union's part in regard to their clauses that their holding fast to." He made no specific offer and the Union did not seek clarification.[3] Instead Fitzgerald responded that "Wages are not the only thing that's important in a contract" and went on to discuss other parts of the proposed agreement, insisting that the Union contract would have to contain the four "must" provisions. Waldron argued that a small company like Almeida could not allow drivers to select their routes on the basis of seniority and stated that the company would recognize the rights of seniority in hiring, firing, layoff, promotion and demotion.

At the meeting of the 25th Waldron repeated his offer to go further on wages but that he expected the Union to abandon its demand for a union shop and job selection. He gave no details and was again rebuffed. He testified that at this meeting the federal mediator went through the contract clause for clause and concluded that "there's only four points in disagreement here," namely, the "must" provisions demanded by the Union. He conceded that although wages were not mentioned by the mediator, there was no agreement on that point. Fitzgerald informed Waldron that if no agreement was reached the employees would strike on April 27. Waldron replied that the company had made its offer and he could go no further. On April 27 the employees struck and began picketing respondent's terminal.

Skipping the meeting held on May 1, which accomplished nothing, the final

---

3. Waldron testified that Mrs. Almeida had authorized him to go up to twenty-five cents an hour, which would be given over a period of time, if the union would make concessions on its principal demands.

meeting was held on May 31 in the Boston office of the federal mediator. Fitzgerald suggested to Waldron that in order to get the men back to work he was willing to submit all matters in disagreement to arbitration. Waldron responded that he would put the matter to Mrs. Almeida who, as expected, refused to agree. At this meeting Waldron made the statement that the company was now in a position where it had to give its employees a wage increase. Neither the time nor the amount of such increase was given and the Union sought no details. Waldron explained at the hearing that Mrs. Almeida had long recognized the need to increase the employees' wages but had refrained from doing so in the past because of the union campaigns and, more recently, the pendency of negotiations. Now, with a strike on her hands, and continued agitation from the remaining employees, Mrs. Almeida was getting desperate and told Waldron that she could not continue without raising wages because she wanted no further trouble.

■ About two weeks after the final meeting, Waldron requested a meeting with the federal conciliators. He was told by them that the strike had not affected the public and the service would not intervene in the matter any further. A few days later all of respondent's employees—strike replacements and employees who had not joined the strike—were assembled and, at Mrs. Almeida's request and in her presence, were told by Waldron of an immediate wage increase of ten cents an hour. He further promised that an additional increase of five cents an hour would be granted at the end of the season in September if business held up.

The trial examiner refused to find the unilateral wage increase a *per se* violation of the Act, as was done in National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) under different circumstances, because the complaint did not allege this conduct

as an independent unfair labor practice. Instead, the examiner merely relied on this conduct to strengthen the assertion that respondent had bargained in bad faith. In Katz, the employer instituted unilateral changes in respect of sick leaves, general wage increases and merit increases during the course of lengthy, unsuccessful negotiations for a new contract and before the existence of any possible impasse. The wage increase was considerably more generous than that offered the union and the union was neither advised nor consulted concerning its institution. Here, the wage increase was instituted following an impasse that in reality had been in existence since February when the parties showed themselves determined not to retreat from their positions in regard to arbitration, union shop, job selection and checkoff. Fitzgerald at one point made clear that no clause of the proposed contract was acceptable to him until the entire contract was entered into.

■■ Not having based his reliance on the *per se* doctrine, as formulated in Katz, the examiner should not have inferred a lack of good faith in respondent's unilateral increase of wages unless the manner in which it was done revealed a position inconsistent with that maintained at the bargaining table. See National Labor Relations Board v. Crompton-Highland Mills, 337 U.S. 217, 69 S. Ct. 960, 93 L.Ed. 1320 (1949). The unilateral action in such a situation casts doubt upon the employer's genuine intention to reach agreement with the union. In this case the unilateral wage increase was given after the company failed to interest the Union in negotiating a wage increase at the expense of Union concessions on the "must" proposals. Twice respondent suggested that an increase could be had subject to such concessions but the Union refused to discuss the matter; the "must" proposals were inviolate and would not be traded away on any account.[4] Following this cold-

---

4. For example, on the question of job selection, Fitzgerald stated that it had been a part of the Union's policy for over six-

ty years and he would not change it on this particular contract.

shoulder display by the Union it was not inconsistent for Waldron to announce that wages would be raised out of necessity, when in fact such necessity existed and, hearing no objection or offer to negotiate from the Union, proceed to follow through on that announcement. This is not to say that we believe the Union acquiesced in respondent's plan to raise wages. Waldron's failure to mention the proposed sum involved or the time of its institution precludes such a finding. But we do find that the Union's determination to ignore and reject any wage offer made by respondent which would be contingent on its making concessions as to its four principal demands freed the hands of respondent and allowed it to take a necessary managerial action in a manner consistent with its offers to the Union.

■ An additional inference of bad faith was found in the limited negotiating authority of Waldron. Admittedly Waldron had no authority to depart from the fixed positions taken by Mrs. Almeida on certain of the Union's demands nor did he have the authority, as the trial examiner found, "tentatively to accept commitments which varied from Mrs. Almeida's prior instructions, all subject to final approval by his principal, Mrs. Almeida." However, Waldron personally met with Mrs. Almeida after every bargaining session to "go over each and every item that we had gone through during the day, giving her the pros and cons on it, and [his] thoughts on it," and met again with her in the morning before each meeting to obtain her positions on the matters in disagreement. He was authorized to take positive positions on matters and was given lee-way within the principles laid down by Mrs. Almeida to consummate an agreement. Agreements were worked out on certain clauses of the proposed contract and in certain instances Waldron tried to work out with the Union representatives substitute provisions which he could then carry back to Mrs. Almeida for approval or disapproval. Similar restrictions on negotiating authority have been found adequate by the Board. KXTV, 139 N.L.R.B. 93, 129–130 (1962); McLean-Arkansas Lumber Company, Inc., 109 N.L.R.B. 1023, 1038 (1954). See Lloyd A. Fry Roofing Co. v. National Labor Relations Bd., 216 F.2d 273, 276 (9th Cir. 1954).

■ Respondent's refusal to discuss the contract provisions concerning charter work was found to be indicative of bad faith. The charter work is done by Southern Massachusetts Bus Lines, Inc., a corporation wholly owned by the Almeida family. Although the Board in a previous proceeding found that respondent and Southern Massachusetts were a single employer for purposes of commerce, the Union's certification ran only to respondent. The charter company has buses of its own and leases others from respondent. The trial examiner found that it "sometimes uses Respondent's bus-drivers to operate its charter runs" and the record indicates that it also hires outside drivers. Whether the work for Southern Massachusetts was "a condition of employment" for respondent's employees or merely "extra" work as one of respondent's employees testified in a prior proceeding, is not made clear in the record and respondent's refusal to negotiate on the matter must be taken into consideration along with the other matters it freely bargains on.

■ Other inferences of bad faith are culled from statements made and actions taken by respondent's agents away from the bargaining table and from an admission by Waldron on February 9 that he thought respondent was looking for a strike. These statements reflected the continuing coolness existent between respondent and the Union but, as we have said before, cannot be decisive of attitude unless, when taken together with all else that transpired, it must be concluded that respondent had no intention of reaching agreement with the Union. Such a determination was not extremely difficult to make on the facts presented in Reed & Prince, supra, for there the Union showed a flexibility of approach that reflected a willingness to compromise while the company stood firm on almost every matter. Here, the Union was determined

to negotiate with respondent essentially the same contract it had negotiated with other bus lines. It would not retreat from certain principles and its frustration increasingly mounted when respondent showed no intention to agree to those principles, although it was willing to agree to others.

A decree will be entered setting aside the order of the Board.