NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GOPHER AVIATION, INC., Respondent.

No. 18774.

United States Court of Appeals
Eighth Circuit.

Oct. 24, 1968.

Lawrence J. Sherman, Atty., N. L. R. B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N. L. R. B., on the brief.

James C. O'Neill, of Kelley & Torrison, St. Paul, Minn., for respondent; Mandt Torrison, St. Paul, Minn., on the brief.

Before VOGEL, Senior Circuit Judge, and MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), for enforcement of its order issued against Gopher Aviation, Inc., respondent. The Board's decision and or-

der are reported at 160 N.L.R.B. 130. We deny enforcement.

The alleged unfair labor practices occurred in the State of Minnesota, and this court has jurisdiction under § 10(e) of the Act.

The Board found that the Company violated § 8(a) (5) and (1) of the Act by refusing to bargain in good faith with the Union, thereby occasioning an unfair labor practice strike beginning on April 23, 1965, and that its conduct during the strike further violated the same sections of the Act and prolonged the strike. The Board also found that the Company violated § 8(a) (5), (3) and (1) of the Act by a unilateral termination of the customer service operation at its Fleming Field, South St. Paul facility and the discharge of the mechanics employed there. The Board, without findings, ordered the Company to cease and desist from engaging in surveillance by photographing and taking down the names of striking employees engaged in lawful picketing and threatening to permanently replace strikers. Affirmatively, the Board's order required Gopher to bargain collectively with the Union and to offer reinstatement to striking employees who had made an unconditional request for reinstatement or who do so in the future, to require Gopher to reinstate with back pay 14 terminated Fleming Field mechanics, and to post appropriate notices.

The International Association of Machinists, AFL–CIO, had attempted to organize Gopher's employees at its Rochester and South St. Paul facilities for approximately eight years without success. In an election held November 18, 1964 the Union was successful by a vote of 74 to 66, and certification followed on November 25, 1964. The first negotiating session was held on January 7, 1965, and seven additional meetings were held prior to March 4, 1965 when the Federal Mediation and Conciliation Service was asked to aid in the negotiations. The Mediation Service conducted six more meetings between March 4 and April 22, 1965, but the Union, being dissatisfied

with the progress of the negotiations, struck both facilities on April 23, 1965.

There were 148 employees in the bargaining unit, 16 of whom were employed at the South St. Paul facility. Upon occurrence of the strike mass picketing ensued, at which time non-striking employees were intimidated and harassed, and upon one or two occasions the police had to be called to aid the non-strikers who were attempting to enter the plant. Some 56 members of the unit either did not quit or returned to work, but four of these later resigned. Fifteen new employees were hired but one resigned and another was discharged for incompetency, leaving a total of 65 employees working at both facilities at the time of the trial, which was less than one-half of the average number normally employed.

At the commencement of the strike and the mass picketing, Gopher officials, upon the advice of their attorney, photographed the strikers and made notes concerning those who were picketing their plants. This evidence was obtained in connection with a possible injunctive proceeding, but when the mass picketing subsided within a week or two, the fact was reported to the attorney who advised Gopher to discontinue photographing and recording names.

Gopher notified the striking employees that if they did not return to work by a specific date they would be permanently replaced by new employees, and some of the new employees were accordingly promised that the jobs would be permanent.

On May 3, 1965, approximately ten days after the strike had commenced, Gopher closed the major portion of its Fleming Field, South St. Paul operation. Gopher had purchased this facility in 1960 and it had subsequently lost money every year except one. For example, in 1964 the Fleming Field operation lost $43,323.00, and after the strike its business dropped 50%. When the decision was made to discontinue this operation, 14 of this facility's 16 employees were on strike, and the Company notified them that the facility had been forced to

close and that their jobs were terminated. Later, these employees were offered positions at the Rochester facility. The two non-strikers did not work in the part of the facility which was closed.

█ The Board is in error in holding that the strike was an unfair labor practice strike since it is apparent from the record that it was an economic strike. At the time of the breakdown in negotiations there were only three major issues of disagreement, namely, "union security," "wages" and "seniority." This was admitted by the chief spokesman for the Union. The seniority issue posed no particular problem, as both the Union negotiators and the respondent felt that the problem in this clause could be readily worked out. On the issue of union security, as hereinafter more fully detailed, the respondent had the right to maintain its position on union or modified union shop and could not be compelled to make a concession. This was not an unfair labor practice. The only remaining major issue was obvious inordinate wage demands, and, since there is no substantial evidence to support the Board's finding that the Company refused to bargain in good faith, the strike must be classified as economic rather than justified by an unfair labor practice.

The Board particularized the conduct of respondent upon which it concluded that respondent unlawfully refused to bargain in good faith in violation of § 8(a) (5) and (1) and that, therefore, the strike which began on April 23, 1965 was an unlawful labor practice strike. We find no evidentiary foundation for the particulars upon which the Board based its conclusion.

First, the Board bases its finding of unreasonable delay in commencing the negotiations on the ground that respondent's personnel director, Hargesheimer, stated that there should be a postponement of negotiations to "let us recover from the shock a little bit."[1] This conversation took place immediately after the ballots were tabulated and seven days before the Union was even certified. Pope, who ultimately was to serve as chief negotiator for the Union, did testify that on two or more occasions he talked with someone at respondent's office by telephone suggesting meetings. However, the Union was not even organized at that time, and, of course, its negotiating team had not been selected or its demands formulated. The respondent received a letter suggesting a meeting the first week in January, and such meeting was amicably set for January 4, 1965 but was later postponed to January 7. During the interim before the letter, Pope was busy organizing the new local, and the Union's original proposal was being drafted and was not completed until December 26, 1964. The Union did not inform respondent of the names of its negotiating team until it sent a second letter which was dated December 28, 1964. Respondent, who had never been involved in collective bargaining, was also busy selecting its negotiating team, and the fact that the meeting was had as early as requested after formation of the local and that numerous meetings were engaged in with frequency thereafter belie any inference that there was any delaying tactic attributable to the Company's conduct.

The Company proceeded to negotiate as soon as the local was ready, and under the circumstances if any consequen-

1. Hargesheimer testified:
"Q. Did you have the conversation? A. In the hall, impromptu conversation; not a meeting conversation.
"Q. What did it consist of? A. Well, Monte said, 'Well, we won the election and how about having a meeting tomorrow morning?'
"Q. Who said this? A. Mr. Pope. I said, 'Gee, Monte, let us recover from the shock a little bit. How about next week, although it is Thanksgiving week, how about meeting on the holiday week?' So that was the last that I had heard as personnel manager until the 28th of December when a letter was received from Mr. Pope requesting a meeting the first part of January 1965."

tial delay occurred it was caused more by the Union than by the Company. In any event, the Board was not justified under the above facts in drawing an inference that the Company refused to enter bargaining negotiations in good faith. N. L. R. B. v. Cummer-Graham Co., 279 F.2d 757, 760 (5th Cir.1960); N. L. R. B. v. Landis Tool Co., 193 F.2d 279, 282 (3rd Cir.1951).

Additionally, the Board found that respondent unduly protracted the negotiations after they commenced in January, 1965; that it took shifting positions in rejecting the union security provision; and that it had been negotiating for months before making a wage offer. On the basis of the above, and the fact that respondent's offers were tentative, the Board found that respondent unlawfully refused to bargain in good faith, and that, therefore, the strike which began on April 23, 1965 was an unfair labor practice strike.

We find in the record no evidence of undue protraction of the negotiations by the respondent. When the Union submitted its proposed contract demands on January 7, it did not present a wage scale proposal. Further, it stated that unless the respondent acceded to its union shop demands it was useless to discuss any other terms of the contract. Other meetings were held, however, on January 15, 19 and 29, at which time the contract provisions were thoroughly discussed, and the wage proposal was submitted by the Union on February 2. Between January 7 and February 16, eight negotiating sessions were held and all but 16 of the union contract demands were resolved. Six additional meetings were held with the mediators between March 4 and April 22, and all except seven issues were resolved, four of which were partially resolved. This does not indicate any undue protraction of the negotiations by the Company. See N. L. R. B. v. Dealers Engine Rebuilders, Inc., 199 F.2d 249, 251 (8th Cir.1952), wherein the court held that where 10 negotiating sessions were held over a six-month period and all except

two of the 25 proposals resolved, the company was not guilty of dilatory and delaying tactics and lack of good faith in bargaining negotiations, pointing out that the parties were not compelled to make concessions in order to reach an agreement, but commenting that it was clear that had the two demands for an increase in pay and vacations with pay been granted, no complaint on the ground of delay would have been filed by the union.

■ Even though respondent had more than one reason for its unwillingness to accept the union shop, this does not constitute shifting positions, and it had a moral and legal right under the statute for its position. The evidence reflects that from the very beginning respondent made it plain that it could not in good conscience agree to the union shop. On account of the close vote, it would not agree to a clause compelling it to discharge any employee opposed to joining the Union and it would not compel any employee to join the Union against his wishes. In N. L. R. B. v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952), the Supreme Court, in speaking of the statute, 29 U.S.C. § 158(d), noted that the section "contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession." See also N. L. R. B. v. Newberry Equipment Co., 401 F.2d 604 (8th Cir., Sept. 19, 1968). Respondent had the unquestioned right to take the position which it did on the union shop and this constituted no unfair labor practice.

The Union did offer a modified union shop agreement, which applied to new employees, but respondent considered it worse than the original union shop clause. The respondent ultimately relented to the extent of agreeing to a check-off. While the Union's chief negotiator did not consider this a subject of union security, it is a means of implementing union security. Industrial Union of Marine & Shipbuilding Workers

v. N. L. R. B., 320 F.2d 615 (3rd Cir. 1963).

Since respondent had the right to maintain its position on union or modified union shop, the only remaining major issue was that of wages. It was not until January 26, 1965 that the Union decided on its wage demands. Even then, such demands were not tendered to respondent's negotiating committee at the meeting that followed because of the Union's adamant position from the outset that there was no use to talk about wages unless the Company first agreed to a union shop. At a subsequent meeting when the wage demands were tendered, they were so exorbitant that respondent thought the Union was joking. A computation of the demands calculated to a figure several times the net income of the Company for any year for which there is record evidence. The Board ignored the fact that the respondent's first wage offer was to maintain the *status quo* which appears to be a reasonable offer in the light of the respondent's earnings, particularly when considering that the Union's first wage offer was an additional $250,000.00 per year, although the respondent had never paid a dividend and its average accrued earnings for the preceding three years were approximately $47,527.00 per year.

Subsequently, respondent offered a wage increase approximating $20,000.00, which was close to 50% of the net profits for the Company for the preceding year; and, finally, in an attempt to prevent the strike, the Company offered a package deal that included wage increases in an amount exceeding the entire net profit for the preceding year. The Union, however, rejected the $20,000.00 offer and Pope, as leader of the Union's negotiating team, would not even submit to the membership the last proposal of the respondent which included wage increases exceeding in amount the entire profit for the previous year.

Apparently Pope was determined not to yield on his union shop demands regardless of most liberal wage offers of the respondent. Respondent certainly is not required to bankrupt itself in order to meet the Union's demands.

This court, in N. L. R. B. v. Wonder State Mfg. Co., 344 F.2d 210, 217 (8th Cir.1965), speaking through Judge Matthes, said:

"The fact that respondent did not accede to the Union's proposal but endeavored to secure a contract which it regarded would be compatible with its financial condition, does not of itself establish lack of good faith. The Act does not compel either party to agree to a proposal or require the making of a concession. Furthermore, as we have noted, the Board may not directly or indirectly compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. (Citing cases.)"

There is simply no record evidence to justify a conclusion that the Company did not bargain in good faith and that this was an unfair labor strike. The mediators did not characterize it as an unfair labor practice strike and no evidence in the record will justify such conclusion, but contrarily the strike was an economic one.[2]

Other subordinate reasons are discussed by the Board in its decision and order to support its conclusion that respondent further demonstrated bad faith in its negotiations in violation of the statute, the effect of which prolonged the strike. It would unduly lengthen this opinion to extensively discuss all of these, but we give each our attention.

The Board stated that two weeks after the strike commenced, the meetings resumed and the first action of respondent was to withdraw all its previous offers because of the strike. What the Board failed to take into account was that the

2. We note that the Assistant Regional Director in an exhibit offered into evidence characterized the strike as an "economic strike" and the bargaining as "hard bargaining" on the part of both parties. Of course, hard bargaining is permitted under the law. N. L. R. B. v. Almeida Bus Lines, Inc., 333 F.2d 729 (1st Cir. 1964).

previous offers which were most liberal had been rejected out of hand, and further that the respondent offered to reinstate them if an agreement otherwise could be reached.

Next, the Board mentioned that during the strike respondent granted those who stayed on the job wage raises, but this was after an admitted impasse had been reached, the Union's chief negotiator admitting that negotiations had completely broken down. Actually, the policy of respondent had been to grant merit wage increases on employees' hiring anniversary dates, but this was discontinued after the election until the parties failed to reach agreement by negotiation. Thereafter, wage increases were put into effect for a number of employees and some of them were made retroactive to April 26, but this was after the rejection by the Union of a similar wage increase offer which the Company made on April 22. In Fetzer Television, Inc. v. N. L. R. B., 317 F.2d 420, 424 (6th Cir.1963), it is stated:

> "Since petitioner did not fail to bargain in good faith at the eight bargaining sessions the impasse that resulted was a bona fide one. This being so, the unilateral change in method of pay effected by petitioner *after* the impasse was reached does not evidence a failure to bargain in good faith."

See also N. L. R. B. v. Almeida Bus Lines, Inc., 333 F.2d 729 (1st Cir.1964) ; N. L. R. B. v. U. S. Sonics Corp., 312 F. 2d 610 (1st Cir.1963) ; Bi-Rite Foods, Inc., 147 N.L.R.B. No. 11 (1964).

■ The Board further found that respondent was discriminatorily motivated in closing its South St. Paul customer service facility without prior bargaining with the Union. This facility had lost money since it was purchased in 1960 and the closing thereof had been under consideration for several months prior to this labor dispute, but respondent was advised by counsel after the dispute arose to withhold such action pending an effort to reach an agreement with the Union. While there was no formal notification to the Union of its decision to close this facility, there admittedly had been discussions about this with the Union representatives who had ample opportunity to bargain on the subject, but the Union refused to do so awaiting action on its complaint on the Union charge of unfair labor practice. There were 16 employees at this facility and 14 of them were given notice of termination; the other two, who did not go on strike, not being engaged in this particular work. Subsequently, respondent offered the terminated employees jobs at the Rochester facility and requested Pope to make a list of those who would accept positions at Rochester, but Pope advised that most of them had already obtained better jobs. We do not understand how the Board could classify this as an unfair labor practice when it was purely economic, coupled with the fact that it was informally discussed with the Union and all of the employees offered reinstatement.[3] In N. L. R. B. v. William J. Burns Int'l Detective Agency, Inc., 346 F.2d 897 (8th Cir.1965), this court held that where Burns could not continue business in a particular area without incurring substantial financial loss and there was a lack of antiunion motivation, the division was closed for economic reasons and precluded a finding of unfair labor practice.

■■ Pope admitted time and again that the cause of the strike was union security, seniority and wages. There is no question here about contracting out work such as in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In

---

3. Union representative Pope admitted that this situation had been discussed at the bargaining meetings. He testified:

> "Q. You concede we discussed the South St. Paul situation at this meeting, don't you? A. Sure, because I think we discussed everything that there was to talk about that was in issue."

It was thus arguable that these negotiations were "bargaining." Cf. N. L. R. B. v. Adams Dairy, Inc., 350 F.2d 108, 113, 114 (8th Cir. 1965).

Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Supreme Court held that a partial closing is only an unfair labor practice if motivated by a purpose to chill unionism in any of the remaining plants and is not an unfair labor practice if motivated by economic reasons. The respondent had about $100,000.00 worth of equipment available for use at South St. Paul but the strike had closed the facility down and, in an effort to keep a semblance of business going, respondent moved this equipment to Rochester to at least try to salvage something from it. In any event, this was an economic strike, and respondent had a perfect right to terminate the striking employees and to replace them where necessary. Even where no strike exists and the closing is for financial rather than antiunion reasons, this is not an unfair labor practice. Compare N. L. R. B. v. William J. Burns Int'l Detective Agency, Inc., supra; N. L. R. B. v. Adams Dairy, Inc., 350 F.2d 108 (8th Cir. 1965); N. L. R. B. v. R. C. Mahon Co., 269 F.2d 44 (6th Cir.1959); N. L. R. B. v. Adkins Transfer Co., 226 F.2d 324 (6th Cir.1955).

■ The Union charged that Gopher's offer of permanent employment to replacements and its insistence on an agreement with the Union that they not be discharged in order to make room for the return of striking employees was equivalent to a demand for a status of super-seniority for the replacements in violation of the Act, but we cannot agree.

In N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), the Supreme Court held that it was not an unfair labor practice for the company to replace its striking employees with others in an effort to carry on the business, nor was the company bound later to discharge such others in order to reinstate the strikers. At page 345, 58 S.Ct. at page 910 the Court said:

"Nor was it an unfair labor practice to replace the striking employes with others in an effort to carry on the business. Although § 13 provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

In N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the Court reaffirmed the *Mackay* rule and explained the difference in the effect of super-seniority and permanent replacement at page 230, 83 S.Ct. at page 1146, as follows:

"Super-seniority affects the tenure of all strikers whereas permanent replacement, proper under *Mackay*, affects only those who are, in actuality, replaced. It is one thing to say that a striker is subject to loss of his job at the strike's end but quite another to hold that in addition to the threat of replacement, all strikers will at best return to their jobs with seniority inferior to that of the replacements and of those who left the strike."

The permanent replacement of striking employees by the Company did not amount to super-seniority and was not an unfair labor practice under the *Mackay* rule.

■ Finally, there is nothing mentioned in the Board's decision about respondent's engagement in surveillance by photographing and recording the

names of the striking employees, although it was ordered to cease and desist from such practices. When the picketing situation was mentioned at trial, the general counsel requested production of the pictures which were taken and they were delivered to the court. The general counsel did not see fit to introduce the pictures into evidence. The burden, of course, is upon the general counsel and he has completely failed to prove any misconduct of respondent on this issue. See Boyle's Famous Corned Beef Co. v. N. L. R. B., 400 F.2d 154 (8th Cir., 1968). In any event, the respondent had a right to act as it did.

When the respondent finally offered the final package proposition with agreement for a check-off on the dues and a wage increase in excess of the previous year's entire profit, it seems that the Company had gone as far as it could possibly go in good conscience and certainly as far as it was required to go under the law.

There are numerous instances where it is affirmatively shown that the Company proceeded with negotiations in utmost good faith, many of which are contained in the supplemental record.[4] But it is unnecessary to extend this opinion by discussing them because our review of the record as a whole convinces us that there is no substantial record evidence to support the Board's finding of violation of the Act by respondent's failure to bargain in good faith. The most that can be said is that the bargaining was hard bargaining on the part of both parties, and if the onus is upon any party, in this case it is upon the Union in stubbornly insisting on the Union's security provision and exorbitant wage demand which resulted in respondent's having to endure the strike.

Having so concluded, the issue of the trial examiner's bias asserted by respondent is immaterial to a decision of this case and need not be resolved; however, we say in passing that if that were the only ground on which to deny enforcement of the Board's order, we would be compelled, at the very least, to require a new trial because the record leaves us with the distinct impression that respondent was not afforded a fair trial.[5]

Enforcement of the Board's order is denied in its entirety.

4. The failure of the general counsel to supply a full record upon which a proper determination of the issue here could be intelligently resolved by this court necessitated the filing on the part of Gopher of a 126-page printed supplemental record.

5. An example of some of the trial examiner's gratuitous comments, which the Board, incidentally, specifically disavowed, was, in the Board's words, "that a lawyer's participation in collective-bargaining negotiations is usually an indication that the employer does not intend to reach an agreement; that a management prerogative demand is the traditional means by which employers abort negotiations; and that friction and conflict would have been avoided entirely if the Respondent had agreed to a union shop."

The same trial examiner caused Chief Judge Aldrich of the First Circuit to observe in a footnote to that court's opinion in Caribe General Electric, Inc. v. N. L. R. B., 357 F.2d 664, 665 (1st Cir. 1966):

"Our doubts of the trial examiner's impartiality are based in part upon a review of his heads-the-union-wins, tail[s]-the-employer-loses analysis of the wage increase issue, under which, so far as we can see, whatever the employer had done would have been wrong."

An examiner may give credence and weight to the testimony of the general counsel's witnesses in preference to that of the employer or vice versa, but a complete disregard for the sworn testimony of either party depreciates the examiner's findings and obliges our close examination. Banner Biscuit Co. v. N. L. R. B., 356 F.2d 765, 768 (8th Cir. 1966).