**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHRONICLE PUBLISHING COMPANY, Inc., Respondent.**

**No. 11553.**

United States Court of Appeals Seventh Circuit.

March 2, 1956.

David P. Findling, Associate General Counsel, Frederick U. Reel, Attorney, N. L. R. B., Washington, D. C., Theophil C. Kammholz, General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Kalvin Kahn, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

Frederic D. Anderson, Indianapolis, Ind., George J. Zazas, Indianapolis, Ind., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for respondent.

Before MAJOR, LINDLEY and SWAIM, Circuit Judges.

MAJOR, Circuit Judge.

This matter is before the court upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondent on October 29, 1954, following the usual proceedings under Section 10 of the Act. 112 N.L.R.B. No. 69. Respondent requests that the order be set aside.

The complaint alleges that respondent, on March 8, 1954, through its agent, Edward W. Camp, discharged Lynn E. Boyd "for his membership in and effort on behalf of the Union and has at all times refused to reinstate him," and that such discharge constituted unfair labor practices within the meaning of Section 8(a) (3) and (1) of the Act. Respondent concedes the discharge of Boyd and its refusal to reinstate but denies that such acts constituted unfair labor practices. No question is raised but that respondent was engaged in interstate commerce. The proceeding took the usual course, with a hearing before a trial examiner who in an intermediate report found a violation of Section 8(a) (1) but no violation of Section 8(a) (3).

The Board found a violation both of Section 8(a) (3) and (1), and in doing so stated:

"In view of the circumstances surrounding Boyd's discharge which, in our opinion, were directly related to his activities as active union adherent and later president of the Local, we find that the discrimination in regard to his tenure of employment had the effect of discouraging membership in a labor organization in violation of Section 8(a) (3) of

the Act. Unlike the Trial Examiner, we cannot, in the face of these facts which unquestionably stem out of Boyd's union activities, limit our finding solely on a violation of Section 8(a) (1). The situation here under consideration is uniquely illustrative of discrimination in violation of Section 8(a) (3) which discourages membership and activity in a labor organization."

The sole contested issue here is whether the evidence substantially supports the Board's finding that respondent discharged Boyd for union and concerted activities protected by the Act.

In the beginning it appears desirable to identify the parties and persons who in one way or another are connected with the circumstances attending the controversy. Respondent, an Indiana corporation, publishes the local newspapers and operates an FM radio station in Marion, Indiana. Lynn E. Boyd, the discharged employee, was employed by respondent in its composing or press room as a linotype operator until his discharge on March 8, 1954. On that date, he was president of the Marion Typographical Union No. 286, affiliated with International Typographical Union (A.F.L.) (hereinafter referred to as I.T.U.). He was reelected president on March 7, 1954 (the day previous to his discharge). Boyd had served in such capacity for some six years prior thereto, for one period of four consecutive terms and for another of two terms. He had also been vice president, member of the executive board, member of the scale committee and Chapel chairman during the course of his employment. The union is a labor organization, the membership of which is confined to those employed in respondent's composing room. It is not and never has been in compliance with Section 9(f), (g) and (h) of the Act. Edward W. Camp, who alone was responsible for the discharge of Boyd, was respondent's general manager (sometimes referred to as the vice president). He had a long and friendly relationship with the I. T. U. and had been a member for ten or twelve years. His father, brother and sister had also been members. At one time his membership was terminated for nonpayment of dues, due to inadvertence. In 1943, a committee of the I. T. U. invited him to reapply for membership, which he did, was registered and remained in good standing until he was subsequently given an honorable withdrawal card. Gardner Thomas was respondent's president; Paul Bell, a member of the union, was superintendent or general foreman from July 26, 1953 until a date subsequent to Boyd's discharge, and during the same period Harold Winchell, also a member and secretary of the union, was night foreman or assistant superintendent.

On the evening of March 8, 1954, Boyd and other employees on the night shift commenced work at 5 p. m. About two hours later the employees ordered refreshments. Boyd ordered and received a paper carton of ice cream which was delivered to him at his linotype machine. The circumstances which shortly followed give rise to the unfortunate episode around which the controversy revolves. A number of witnesses testified as to the happenings on that occasion, including Camp and Boyd. As the trial examiner pointed out, there was no substantial difference in their testimony. The examiner set forth in some detail Camp's version of the affair, with the statement that the testimony of Boyd "was not substantially different or in conflict with that of vice president Camp." The Board has adopted the findings of the examiner relative to the testimony of Camp and we shall do likewise.

The examiner found:

"According to Camp's own testimony, he saw Lynn E. Boyd sitting at his linotype machine with the cup of ice cream in his hand, and gave him a dirty look in passing. Upon return from the mail room, Camp approached Boyd, who was standing up at his machine No. 5 with the cup of ice cream in hand talking to an adjacent linotype operator (Moore). Camp said to Boyd: 'Are you work-

ing here?' Boyd said: 'Yes, I like to work here.' Camp said: 'Well, get down and get to work then.' Thereupon, Boyd sat down at his linotype machine, and Camp stood there watching him. Boyd then turned around and said: 'You get away from here, I can't work with you looking over my shoulder.' Camp continued: 'I don't think you want to work here. Why don't you get out? You don't act like you like it here. I noticed that there are a couple of situations up there posted on your bulletin board, so if you don't like the work here, you won't be without a job very long.' Boyd inquired: 'Are you firing me?' —stood up and said: 'I know why you're firing me, it's for my union activities.' Camp became incensed at this accusation, got madder and madder, and loudly said: 'If you say that again to me, I'll knock you on your ass; get out, get out;' and may have also said: 'you are just leading these men into a bunch of trouble.' Boyd said: 'Give me a little time to get my coat or jacket;' and proceeded to the locker room, followed by Camp. At the locker room, Boyd said to Camp: 'If you were ten years younger, I'd knock your block off,' or words to that effect."

Further, as the examiner notes, Boyd testified that when he mentioned the fact that other employees were also eating ice cream, Camp said, "I don't care what any other man does, you're the guy I'm after, you are the trouble maker here," and that Camp called him vile names. Also, Boyd denied saying to Camp, "If you were ten years younger, I'd knock your block off," but admitted that he said, "Ed, if you were ten years younger, I'd give you an invitation." There is no disagreement but that Camp during the controversy was in a highly nervous and agitated state of mind, got "madder and madder," and became infuriated when Boyd made the accusation that he was being fired for his "union activities."

While we adopt the examiner's appraisement of Camp's testimony, we think fairness requires that it be supplemented as to one incident in particular which is not mentioned either by the examiner or the Board. Camp testified that when he visited the composing room shortly after the night shift had commenced its work, he noticed that Boyd was not at his machine and that he was not there a few minutes later. He gave the matter no particular attention, however, as he thought perhaps it was Boyd's night off. Boyd testified that he was at his machine at all times from 5 to 7 o'clock, except perhaps for a five minute period when he went to a wash bowl to wash his hands and that he immediately returned to his work. Marvin R. Lewis, foreman of the press room and a member of the Pressmen's Union, testified that he went to the locker room about 15 minutes after 5, to wash and change his clothes, as he did every day at the end of his shift. He stated that he was in the locker room for a period of fifteen minutes and that Boyd was there when he entered and when he left, doing nothing but looking out of the window and smoking. This testimony was not denied. There is no evidence that Camp had knowledge of this incident as testified to by Lewis but it does corroborate Camp's testimony that Boyd was not at his place of work when Camp visited the room shortly after 5 p. m., and by the same token it contradicts Boyd's testimony that he was on the job at all times.

Camp testified that when he again went through the composing room at about 7 p. m., Boyd was seated and eating ice cream from a cup, and a few minutes later when he returned, Boyd was standing up eating ice cream, looking directly at Camp in an insolent manner as if daring Camp to assert his authority, and that when Boyd finally sat down at his machine he did not start to work but said to Camp in a belligerent manner, "You get away from here, I can't work with you looking over my shoul-

der." At about that time foreman Winchell entered the room and Boyd, at his request, left. On the following day Boyd requested a written explanation of his discharge. Accordingly, Camp drafted a letter addressed to Boyd which stated that he was "discharged for neglect of duty at this and other times," and requested that night foreman Winchell sign it. (This was in conformity with a union rule.) Winchell revised the letter to read, "neglect of duty at this specified time" and, as revised, the letter was mailed to Boyd. While it is agreed on all hands that Boyd was discharged by Camp, it is uncertain at what point in the episode the discharge took place. It is to be noted that the most that was said by Camp during the main controversy was, "I don't think you want to work here. Why don't you get out?" It was Boyd who stated, "Are you firing me?" then stood up and said, "I know why you are firing me, it's for my union activities." And there is no doubt but that this accusation by Boyd infuriated Camp. The examination of Camp by the trial examiner is significant. Referring to the time that Boyd left his machine for the purpose of getting his clothes, the examination is as follows:

"Trial Examiner: Is that the point at which you discharged him?

The Witness: I don't think so. I think that when he threatened me that way, I think that is when my mind was fully made up. There was no way to get along with that, you see.

Trial Examiner: You don't consider then that you had discharged him until he went to get his clothes and then said something to you about knocking your block off?

The Witness: I think the situation could have been saved up to that point.

Trial Examiner: You mean—how?

The Witness: Well, maybe if he had said I'll go to work and let's forget this—actually, I didn't want to discharge Boyd."

Camp testified that he had never discussed the possible discharge of Boyd with Thomas or anyone else. In fact, there is no evidence that Camp had previously entertained any thought relative to the discharge of Boyd. Camp categorically denied that the discharge was motivated by Boyd's union activities. He testified: "Boyd had held union jobs for years and years and years; I know that he was active in the Union. We don't care if the men are active in the Union. In fact, I think it would be a good idea if they would take more interest in their Union." He further testified that he fired Boyd for neglect of duty in that he was not working and because of the latter's threat to "knock my block off."

■ After a careful perusal of the record, we are convinced that the decision of the Board is clearly erroneous. We think it pertinent to observe that the Board has long pressed upon courts the importance to be attached to a hostile anti-union attitude on the part of an employer in characterizing its acts. This has often been referred to as background, and in innumerable cases has been utilized for concluding that an act by an employer, otherwise innocent, is discriminatory. Conversely, we think that an employer with a friendly, sympathetic union attitude is entitled to credit in characterizing its acts which in themselves may not be discriminatory. We doubt if any case has been before this or any other court where there is such an undisputed demonstration of a lack of all hostility or anti-union bias. The trial examiner, not the Board, gave some recognition to this favorable background. The examiner stated:

"The record likewise fails to show that Respondent was motivated by antiunion animus or a desire to discourage membership in the Union. For many years the Respondent has voluntarily recognized and bargained with the Union as exclusive bargaining representative of its employees in the composing room, despite the fact that the Union has failed to comply with Section 9(f),

(g), and (h) of the Act and has never been certified by the Board as such bargaining representative."

It may be added that respondent for years has employed none other than union members, although it was under no obligation to do so. It also employed supervisors who were members of the I. T. U. who had the authority to employ as well as discharge. The I. T. U. by agreement with respondent made up the seniority list, had its own bulletin board under its sole control, held Chapel meetings in the shop and started and stopped the work by "calling time." As already noted, Camp, who was responsible for Boyd's discharge, was pro-union; Bell, the superintendent or general foreman, was a member of the union, and Winchell, the night foreman or assistant superintendent, was a member and secretary of the union. There is no proof that respondent had previously been accused of any sort of discrimination against its employees because of their union membership or any concerted activities in which they engaged.

The weakness of the Board's reasoning is illustrated by the trivial and insignificant incidents upon which it relies. In January 1953 (more than a year prior to Boyd's discharge), some words passed between Boyd and president Thomas at a meeting concerning a profit sharing plan opposed by Boyd. The latter took issue with statements made by Thomas at that meeting. A year later, in January 1954, Boyd in a meeting again challenged statements made by Thomas concerning past wage increases and the cost-of-living escalator granted by respondent. Thomas thought that Boyd was questioning his integrity, became irritated, and the next day made the statement that he intended to charge Boyd with insubordination, which he did not do.

The only incident of any consequence relates to an occurrence of March 3, 1954. At that time Thomas had been informed that Boyd was engaged in a movement to persuade the pressmen to agree with the I. T. U. in withdrawing the union label from respondent's paper. As to this incident the examiner stated:

"On March 3, 1954, President Gardner Thomas approached Boyd at work in the composing room, and said: 'I understand that you are attempting to withdraw the label,' or words to that effect. Boyd admitted the accusation, and President Thomas retorted: 'Well, that's the kind of game you are playing,' and left the composing room. The union label was withdrawn on March 18, 1954, by Chapel Chairman Paul G. Prail upon instructions from the union president (Boyd)." (This was ten days after Boyd's discharge.)

The trial examiner denied respondent's offer of proof that withdrawal of the union label would have no effect on its business, with the statement, "So, as far as the Trial Examiner knows, the union label has no significance in this proceeding."

Another incident relied upon is the so-called "Pauley letter." The letter was written by a printing company in Indianapolis to Winchell as union secretary, who read it at a union meeting on the night of Sunday, March 7, 1954. The letter stated that the Indianapolis plant was in need of printers and contained an outline of wages and working conditions, with the suggestion that any interested printer contact it. The letter was read at the union meeting, as was customary, and it was suggested from the floor of the meeting that the letter be posted on the bulletin board, which was normal procedure. Winchell gave the letter to Boyd and Boyd as president directed a union official by the name of Miller to post it, which Miller did on the following day. Both Winchell and Miller were still employed by respondent at the time of the hearing. The concluding incident relied upon by the Board is the fact that Boyd was reelected president of the union on the day preceding his discharge. As noted, however, he had previously served six terms as president of the union, as well as in numerous other union offices.

The most that can be said from these incidents is that some resentment had developed on the part of Thomas toward Boyd, but at the same time the proof furnishes no basis for the theory that such resentment was because of Boyd's membership in the union or his activities in connection therewith. In fact, the record dispels any unfavorable inference in that respect. More than that, there is no proof that Camp had knowledge of any resentment on the part of Thomas or of Boyd's activities which gave rise thereto. While we recognize that respondent is accountable for any discriminatory act by Camp, its supervisory employee, it is not discernible how any resentment of Thomas toward Boyd can be attributed to Camp in the absence of proof that Camp had knowledge thereof. Cf. Goldblatt Bros., Inc., 77 N.L.R.B. 1262.

Any connection between Camp's statements to Boyd, "You are the troublemaker here" and "you are just leading these men into a bunch of trouble," and Boyd's union activities is purely speculative. Those statements are just as consistent, and in view of the past relation of the parties more so, with insubordination on the part of Boyd. Moreover, such statements do not afford the slightest basis, by inference or otherwise, that Camp's motive in discharging Boyd was to discourage membership in the union. Respondent's past history in employing only union men even though not obligated to do so, its long friendly relations with and cooperative attitude toward the union, as well as Camp's past relations with the union, completely dispel even a suspicion which might otherwise arise on that score.

While Boyd undoubtedly had been a valuable employee, the record abundantly discloses that he had an exaggerated notion of his importance. On the occasion in controversy, he carried a "chip on his shoulder" and, in effect, dared Camp to exercise the authority which was rightfully his. Camp became infuriated and one harsh utterance led to another, which culminated in the discharge of Boyd. The record furnishes no basis even for an inference that Camp at the time he entered the press room had the slightest idea of discharging Boyd for any reason, much less because of his union activities. His action was the result of the events of the moment, taken while he was in an infuriated state of mind. We need not be concerned with whether Camp acted wisely or unwisely or whether his action was more drastic than the circumstances justified. The point is that there is no reasonable basis on this record to conclude that Camp discharged Boyd because of his union activities, to discourage membership in the union or for any other reason violative of the Act. Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613, 617; Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855, 859.

Upon a careful review of the record, we are satisfied that neither the trial examiner's nor the Board's findings support the latter's order. The Board's petition for enforcement is denied and respondent's request that the order be set aside is granted.