**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

CURTIS JAMES LEAK; TKC, INC.,
Claimants-Appellants,

and

5709 HILLINGDON ROAD, CHARLOTTE,

No. 93-2302

NORTH CAROLINA, (Deed Book 5062,
Page 119, Mecklenburg County
Register of Deeds); A 1989 FORD
TAURUS, VIN 1FABP52DOKG172210,
Defendants,

KAREN TINSLEY LEAK;
CHARLOTTE-MECKLENBURG COUNTY TAX
COLLECTOR,
Claimants.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

KAREN TINSLEY LEAK; CURTIS JAMES
LEAK,
Claimants-Appellants,

and

No. 96-1873

5709 HILLINGDON ROAD, CHARLOTTE,
NORTH CAROLINA, (Deed Book 5062,
Page 119, Mecklenburg County
Register of Deeds); A 1989 FORD
TAURUS, VIN 1FABP52DOKG172210,
Defendants,

TKC, INC.; CHARLOTTE-MECKLENBURG
COUNTY TAX COLLECTOR,
Claimants.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-91-190-C-C-P)

Argued: March 3, 1997

Decided: August 26, 1997

Before WILLIAMS and MICHAEL, Circuit Judges, and
GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Michael wrote
the opinion in which Judge Williams and Judge Goodwin joined.

_____

2

**COUNSEL**

**ARGUED:** Michael Smith Scofield, Charlotte, North Carolina; James Frank Wyatt, III, Charlotte, North Carolina, for Appellants. Frank DeArmon Whitney, Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

Claimants-appellants Curtis Leak and Karen Leak lost their home and car on summary judgment in this forfeiture action. The government contends that the Leaks intentionally structured a series of bank deposits to avoid the reporting requirements of 31 U.S.C. § 5313(a). Because the Leaks used the money deposited to pay off their home mortgage and used their car to make some of the deposits, the government brought a civil forfeiture action against the home and car under 18 U.S.C. § 981(a)(1)(A). This statute allows the government to forfeit property that has been "involved in a transaction . . . in violation of section 5313(a) or 5324(a) of title 31 . . . or any property traceable to such property." After the magistrate judge made a finding of probable cause for forfeiture, the government moved for summary judgment. The Leaks, in affidavits filed in opposition, offered explanations and claimed they did not know of the reporting requirements and therefore did not intentionally try to evade them. The district court, finding the Leaks' claims to be "incredible," granted summary judgment for the government. Because we believe there is a genuine issue of material fact about whether the Leaks knew of the reporting requirements, we reverse and remand for trial.

I.

Curtis and Karen Leak are a married couple with five children who live in Charlotte, North Carolina. Mr. Leak (through TKC, Inc.) owns and operates a nightclub known as "Side Effects." Mrs. Leak is an accountant at Duke Power Corporation, and she is listed as the corpo-

3

rate secretary for TKC. Defendant property 5709 Hillingdon Road is the Leaks' family home, and defendant 1989 Ford Taurus is the Leaks' car.

On January 17 and 18, 1991, the Leaks made a series of deposits into checking accounts at three banks, Wachovia Bank & Trust Company, Southern National Bank, and First Citizens Bank. Eleven cash deposits ranging from $2,900 to $5,200 were made into Mr. Leak's personal account at Wachovia; these deposits were made at ten different Wachovia branches and totaled $51,100. Eleven cash deposits ranging from $2,500 to $5,000 were made into Mr. Leak's personal account at Southern National; these deposits were made at five different branches and totaled $50,700. Finally, eleven cash deposits ranging from $2,500 to $5,000 were made into Mrs. Leak's personal account at First Citizens; these deposits were made at seven different branches and totaled $50,500. The day before these deposits were made, the Leaks had drafted a check for $50,684.54 from each account. The Leaks used the three checks to pay off the mortgage on their home. The Ford Taurus was used to make at least two of the deposits.

A couple of months later, on March 20, 21, 29, and 30 and April 1 and 16, 1991, the Leaks made fourteen cash deposits ranging from $1,100 to $5,000 to Mr. Leak's Wachovia account. These deposits, totaling $54,110, were timed to cover six checks ranging from $4,275 to $12,325 made to a contractor who was building an addition onto the Leaks' home. The checks to the contractor totaled $52,647.

On June 21, 1991, the United States filed a complaint seeking in rem forfeiture of the Leaks' home and car pursuant to 18 U.S.C. § 981. That same day the government obtained a warrant enabling the United States Marshal to take the properties into his possession. The magistrate judge who issued the warrant found probable cause based on the affidavit of IRS Special Agent Michael J. Toomey, Jr., who discussed the deposits made by the Leaks, the apparent use of the deposited funds to pay off the mortgage and to pay for the addition to the house, and the use of the car to make the deposits.

The Leaks and TKC filed claims to the properties. On February 26, 1993, the United States moved for summary judgment on the claims

of Curtis Leak and TKC. The government relied on the earlier Toomey affidavit and submitted the deposition testimony and affidavit of a Wachovia Bank service representative who had cashed a $15,000 check for Curtis Leak in 1989. The representative said that pursuant to her routine practice she would have told Mr. Leak, "Due to the large amount of this check, we [the bank] would need to file a currency transaction report [CTR] with the IRS." J.A. 58. She said Mr. Leak seemed to be in a rush and became agitated when told about the CTR requirement.

Curtis Leak and TKC opposed the motion for summary judgment. In an affidavit Mr. Leak insisted that he had "absolutely no knowledge whatsoever of any requirement of the bank to file a special form with the IRS if I made a deposit of more than $10,000 in cash." J.A. 93. He claimed that he had broken down his deposits into increments of $5,000 or less because "I did not want people inside the bank or people entering the bank to see me with large sums of cash, nothing in excess of $5,000." J.A. 93. Noting that he was "the owner of a popular night club located in a section of the black community which is a high-crime area," Mr. Leak said that he has "always been concerned about my personal security" and in the past had "overheard bank tellers discussing other people's accounts." J.A. 93. His method of making the deposits was therefore chosen "for security reasons, [and he] felt this was the safest thing to do." J.A. 93. Mr. Leak claimed that he had no desire to conceal his deposits; in fact, he had notified the trustee in the Leaks' bankruptcy case of his intention to pay off his mortgage with the deposited funds.[1] In response to the testimony of the bank representative, Mr. Leak said he did not remember any mention of reporting requirements. At the time he felt he was being hassled "because I had a $15,000 check and I was black." J.A. 93.

Despite Mr. Leak's statement denying knowledge of the reporting requirements and offering an explanation about the deposits, the district court granted summary judgment against him and TKC. The court said that to survive summary judgment, Mr. Leak had to "show [that] the [magistrate judge's] probable cause finding was factually or legally baseless." J.A. 127. The court found (based on its reading of the summary judgment papers) that Mr. Leak's lack of knowledge

_____

[1] The Leaks filed for Chapter 13 bankruptcy in 1986.

5

claim was "an incredible assertion" and that the "perplexing series of deposits renders a claim of outright ignorance of such reporting requirements at least improbable." J.A. 129 (emphasis in original). The court concluded that Mr. Leak had failed to rebut the showing of probable cause and therefore had forfeited his claim to the properties.

On February 27, 1996, the United States filed a motion for summary judgment against the claim of Karen Leak. Mrs. Leak opposed the motion and filed her own affidavit. She began by saying that she made "only a couple" of the deposits. J.A. 209. She claimed that she too "had no knowledge of any cash transaction reporting requirements under the law during the time of the deposits." J.A. 210. She said that the deposits represented "legitimate income derived from my husband's night club, a cash intensive business, and were not the result of any illegal activity to my knowledge." J.A. 210. The government submitted a supplemental affidavit from Agent Toomey that alleged additional circumstantial evidence concerning the Leaks' knowledge of the reporting requirements. Mrs. Leak filed a motion to strike portions of this affidavit as inadmissible for purposes of summary judgment. The district court did not rule on this motion but did not rely on any of the additional information. The court determined that Mrs. Leak had to meet the requirements of an "innocent owner" and concluded that she failed to do so. The court restated its earlier finding that "there is no doubt that [Mrs. Leak's] husband knew about the reporting requirement" and concluded that her "claim that she was unaware of her husband's structuring scheme is untenable." J.A. 350, 351. The district court found that she was aware of the deposits and that her explanation for the manner of the deposits was "incredible as a matter of law." J.A. 351. The court therefore granted summary judgment against Mrs. Leak's claim and issued a final judgment of forfeiture against the defendant properties. The Leaks and TKC appeal. We review the district court's grant of summary judgment de novo. See United States v. Jefferson-Pilot Life Ins. Co., 49 F.3d 1020, 1021 (4th Cir. 1995).

II.

The United States brought this forfeiture action under 18 U.S.C. § 981. That statute provides that "[a]ny property, real or personal, involved in a transaction . . . in violation of section 5313(a) or 5324(a)

6

of title 31 . . . or any property traceable to such property" is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). Pursuant to 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22(a)(1), financial institutions are required to file a Currency Transaction Report for every transaction involving over $10,000 in currency. The government contends that the Leaks violated 31 U.S.C. § 5324(a)(3), which states that "[n]o person shall for the purpose of evading the reporting requirements of section 5313(a) . . . structure or assist in structuring . . . any transaction with one or more domestic financial institutions."[2] According to the government, the Leaks structured their deposits to fall under the $10,000 limit so as to avoid the filing of a CTR.

In order to hold the property forfeited under 18 U.S.C. § 981, the government must show that the Leaks' home and car were "involved in" an illegal structuring or are "traceable" to property that was involved in such structuring. The government need not prove that both Curtis and Karen Leak were involved in the structuring; a transgression by one of the owners is sufficient to forfeit the property. However, the statute does provide some protection for "innocent owners." Section 981(a)(2) provides that "[n]o property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder." Thus, if one owner did commit an act that warrants forfeiture of the property, the other owner can retain his or her interest if he or she had no knowledge of the underlying act.

The procedure used in civil forfeiture is different from that used in a standard civil action. When the government brings a forfeiture action against a property, it must first show probable cause that the property is liable for forfeiture. In order to meet this burden, it must "show probable cause that a substantial connection exists between the property forfeited and the criminal activity defined by the statute." United States v. $95,945.18, United States Currency , 913 F.2d 1106,

_____

[2] At the time the government filed its complaint, this section was designated 31 U.S.C. § 5324(3). It was redesignated as § 5324(a)(3) in 1992. See Pub. L. No. 102-550, § 1525(a)(1), 106 Stat. 3672, 4064 (1992). Section 5324 was originally enacted into law in 1986. See Pub. L. No. 99-570, § 1354(a), 100 Stat. 3207, 3207-22 (1986).

1110 (4th Cir. 1990). The applicable definition of probable cause "is the same as that which applies elsewhere: `reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" Id. (quoting United States v. $364,960 In U.S. Currency, 661 F.2d 319, 323 (5th Cir. Unit B Nov. 1981)). Once the government makes the showing of probable cause,"the burden of proof shifts to the claimant to establish, by a preponderance of the evidence, that the property was not used in violation of the law or was not intended to be used unlawfully." Boas v. Smith, 786 F.2d 605, 609 (4th Cir. 1986); see 19 U.S.C. § 1615, as incorporated by 18 U.S.C. § 981(d).

Agent Toomey's affidavit about the Leaks' deposits was sufficient to meet the government's burden of probable cause. Cf. United States v. Dollar Bank Money Market Account No. 1591768456 , 980 F.2d 233, 237 (3d Cir. 1992) (concluding that evidence of twenty-six deposits, most just under $10,000, at seven different banks within a nineteen-day period justified the district court's finding of probable cause). It is clear, however, that the district court here used the wrong standard in determining whether Curtis Leak's and TKC's claims could survive summary judgment. According to the district court, Mr. Leak had to "show the probable cause finding was factually or legally baseless." J.A. 127. The court described the standard as follows:

> In considering whether a probable cause finding has been rebutted, this Court must give "[g]reat deference . . . to . . . a magistrate's assessment of the facts. . . ." United States v. Williams, 974 F.2d [480,] 481 [4th Cir. 1992].**3** This Court need only ask "whether the magistrate had a substantial basis for his conclusion that probable cause existed." Id. In other words, Claimant must show the magistrate wrongly assessed the facts before him because there was no substantial basis for concluding that the law had been violated and that the property at stake was linked to the violation.

_____

**3 United States v. Williams**, 974 F.2d 480 (4th Cir. 1992), concerns whether a magistrate had correctly found probable cause to issue a search warrant; it has nothing to do with civil forfeiture.

8

J.A. 128. Thus, in order to survive summary judgment under the district court's standard, the Leaks would have had to "rebut" the probable cause finding by showing that the magistrate "wrongly assessed the facts" in concluding that probable cause existed. Under this standard, property could be forfeited on just a showing of probable cause, that is, on facts amounting to less than prima facie proof but more than mere suspicion. Cf. United States v. One Parcel of Real Property, 904 F.2d 487, 492 (9th Cir. 1990) (Kozinski, J.) (noting that to adjudge "property . . . forfeitable on probable cause alone [is] something the statute does not provide for and might well be constitutionally suspect").

The district court seems to have mistaken the meaning of "rebut the showing of probable cause" as used in cases such as $95,945.18. See $95,945.18, 913 F.2d at 1111 ("[Claimant] has not set forth any facts to rebut the showing of probable cause."). This phrase only means that once probable cause is established, the burden of proof shifts to the claimant, who bears the ultimate burden of persuasion. Here, however, after the magistrate judge found probable cause, the government did not simply wait for trial; it instead moved for summary judgment. The question, then, is what did the Leaks have to do to avoid summary judgment. They did not have to show that the magistrate judge was wrong in deciding probable cause. Rather, they only needed to show, as normal opponents of summary judgment, that a genuine issue of material fact existed as to whether their property was subject to forfeiture. See United States v. 717 S. Woodward St., 2 F.3d 529, 532 (3d Cir. 1993) ("[W]e know of no basis for concluding that the precepts governing resolution of summary judgment motions generally are not equally applicable to summary judgment motions in forfeiture proceedings."). What the Leaks knew of the reporting requirements is a "material" fact in this § 981 forfeiture case. Of course, the question of whether that material fact creates a genuine issue must be evaluated in light of the substantive standard of proof that would apply at a trial on the merits. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (holding that a summary judgment motion must be considered in light of the evidentiary burden the substantive law places on the non-moving party).

As we noted above, once the government establishes probable cause that the Leaks' property is subject to forfeiture, the burden

9

shifts to the Leaks to show by a preponderance of the evidence that forfeiture is not warranted. Despite this shift in the burden of proof, the government, if it chooses to move for summary judgment, has the responsibility to show that there is no genuine issue of material fact. See United States v. Four Parcels of Real Property, 941 F.2d 1428, 1439 (11th Cir. 1991) (noting that when seeking summary judgment in a forfeiture action, the government has the "initial responsibility of demonstrating the absence of a genuine issue of material fact" (quotations omitted)); cf. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2727, at 121 (2d ed. 1983) ("It is well-settled that the party moving for summary judgment has the burden of demonstrating that the Rule 56(c) test -- `no genuine issue as to any material fact' -- is satisfied and that he is entitled to judgment as a matter of law."). As a result, "the government cannot prevail on summary judgment if the [Leaks] offer[ ] a reasonable and legitimate explanation for the organizing of transactions in amounts under $10,000, and the explanation is verified by facts and circumstances which, if believed, would enable a rational jury to conclude by a preponderance of the evidence that [the Leaks did not have knowledge of the] reporting requirements." Dollar Bank, 980 F.2d at 241.

The district court's decision to grant summary judgment was clearly influenced by its use of the wrong standard-- namely, whether the original probable cause determination was correct. After dismissing as "improbable" Curtis Leak's statement that he did not know about the CTR reporting requirements, the district court added: "In any case, this `evidence' does not make it more likely than not that the magistrates' [sic] finding of probable cause lacked a substantial basis." J.A. 129-30. In response to Mr. Leak's claim that his state of mind was an issue of credibility, the court found that "Claimant's conduct alone . . . speaks for itself and supports a finding of probable cause." J.A. 132. See also J.A. 132 (noting that "the magistrate had a substantial factual basis for concluding there was probable cause to believe Claimant violated the law"). Finally, in summing up its analysis, the court said:

> The material facts are not in dispute. Claimant's depositing practices on January 17 and 18, 1991, permit the inference that he knew the transaction reporting requirements existed.

10

Those facts also demonstrate enough evidence for a finding of probable cause to believe Claimant structured those transactions to avoid the filing of CTR's. That is all the law requires. The Court finds that Claimant has not successfully rebutted, to a preponderance of the evidence, the magistrate's finding of probable cause in this case.

J.A. 132.

The district court evaluated the evidence forecast under the wrong standard. We will now analyze the evidence under the correct standard and determine whether there is a genuine issue of material fact.

III.

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, we must construe "the facts and inferences in the light most favorable to the non-moving party." Donmar Enters., Inc. v. Southern Nat'l Bank of N.C., 64 F.3d 944, 946 (4th Cir. 1995). The Supreme Court cautioned in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

The Leaks do not contest that they made the thirty-three deposits in question on January 17 and 18, 1991, and the fourteen deposits from March to April 1991. However, both Leaks have sworn in affidavits that they had no knowledge of the reporting requirements. A violation of 31 U.S.C. § 5324(a)(3) only occurs when "the violating party had knowledge of the reporting requirements and acted to avoid them." United States v. Wollman, 945 F.2d 79, 81 (4th Cir. 1991) (quotations omitted). As the moving party the government must demonstrate that there is no genuine issue of material fact as to knowledge, even though the Leaks have said in affidavits that they did not know of the reporting requirements. Of course, whether the Leaks' affidavits create a genuine issue of material fact as to knowledge must

11

be evaluated in light of their evidentiary burden under the forfeiture statute. See Anderson, 477 U.S. at 252.

We note at the outset "the general rule that summary judgment is seldom appropriate in cases wherein particular states of mind are decisive elements of a claim or defense." Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). This is so because "a party's mental state is inherently a question of fact which turns on credibility." Dollar Bank, 980 F.2d at 240. See also United States v. 717 S. Woodward St., 2 F.3d 529, 534 (3d Cir. 1993) ("When the state of mind of a person is at issue and the record contains direct evidence of that state of mind in the form of that person's sworn statement, conflicting circumstantial evidence normally creates only an issue of credibility for trial and summary judgment is inappropriate."). As we recognized in American Mfg. Assoc., Inc. v. N.L.R.B., 594 F.2d 30 (4th Cir. 1979), "it can be well-nigh impossible to prove that one did not know something in the past by any other means than sworn denials." Id. at 35 (quoting N.L.R.B. v. Whitfield Pickle Co., 374 F.2d 576, 581 (5th Cir. 1967)). These expressions all serve to remind us of the context in which we consider the Leaks' affidavits denying knowledge of the reporting requirements.

The government claims that the evidence as to the Leaks' knowledge and intent to evade is "so substantial that no reasonable fact finder could conclude that [they] did not know." Brief for Appellee at 33. The government first points to the deposit structuring itself as proof of the Leaks' knowledge. The large number of deposits, most around $5,000, at multiple bank branches certainly could permit the inference that the Leaks knew of the requirements and were trying to evade them. This series of transactions, however, cannot by itself foreclose all issues of material fact in the face of the Leaks' sworn denials. As the court said in Dollar Bank, a civil forfeiture case in which the government's summary judgment motion was denied:

> Proof that the accused structured transactions in amounts under $10,000 is not enough. It must also be proven that he structured for the specific purpose of evading the federal reporting requirements. If a person were ignorant of the requirements and deposited a large amount of cash in $9,000 installments, he would not violate section 5324. A jury

12

might infer from such conduct that he knew of the law's requirements and tried to evade them, but proof of the conduct does not automatically prove, as a matter of law, the intent to avoid reporting.

Dollar Bank, 980 F.2d at 237.

The government argues that the testimony of Susan Renckens, a service representative for Wachovia Bank, provides direct evidence of Mr. Leak's knowledge. On September 13, 1989, Ms. Renckens assisted Mr. Leak in cashing a check for $15,000. The government claims that during the transaction Ms. Renckens told Mr. Leak that the reporting requirements applied not only to check cashing but also to cash depositing. In particular, the government points to the following answers its lawyer drew from Ms. Renckens in her deposition:

> Q. By the end of your interaction with Mr. Leak, do you feel that he understood that CTR's were a requirement when you were either depositing or withdrawing --
>
> A. I believe he did.
>
> Q. -- in excess of $10,000?
>
> A. (Witness nods head affirmatively.)

J.A. 67. Ms. Renckens also says in her affidavit, which was prepared by Agent Toomey, see J.A. 72, that she "informed Mr. LEAK that since the amount of cash exceeded $10,000, I was required by law to prepare a CTR." J.A. 36.

However, upon closer examination Ms. Renckens' testimony does not provide the solid proof of knowledge that the government claims. Earlier in Ms. Renckens' testimony, Mr. Leak's lawyer questioned her about what she remembered telling Mr. Leak. The exchange went as follows:

> Q. Now, do you recall what you said to him about the CTR?

13

A. I couldn't tell you exactly. What I -- I can tell you what I would probably have said. It's been so --

Q. All right. Is there a routine that you --

A. Just routinely, we say, "Due to the large amount of this check, we would need to file a currency transaction report with the IRS and the North Carolina Department of Revenue," who we also report to.

Q. Do you recall if he asked you any questions at that point?

A. I don't believe he did, if I can remember.

Q. And would you go into any more detail than just the statement you just gave? That would be your routine thing to say to customers?

A. Right. . . .

J.A. 58-59 (emphasis added).

The above testimony makes clear that Ms. Renckens only claims to have told Mr. Leak about the reporting requirements in the context of cashing a check. Ms. Renckens never claims that she told Mr. Leak that CTRs were also required for cash deposits. Since it is certainly riskier for a bank to cash a check than to accept a cash deposit, it is reasonable for Mr. Leak to have assumed that CTRs were required only for check cashing. Ms. Renckens did respond affirmatively when asked whether she felt that Mr. Leak "understood" that CTRs were required for both withdrawals and deposits. But again, her testimony about what she "probably" told Mr. Leak does not mention anything about deposits. Because Ms. Renckens did not offer any specific factual support for her belief that Mr. Leak understood the reporting requirement for deposits, we cannot credit Ms. Renckens' belief as proof of Mr. Leak's knowledge. See Fed. R. Evid. 701 (lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are . . . rationally based on the percep-

14

tion of the witness"). It would be especially inappropriate at this point to accept Ms. Renckens' inference that Mr. Leak had full knowledge because on summary judgment "all justifiable inferences are to be drawn in [the nonmovant's] favor." Anderson, 477 U.S. at 255.

Moreover, Curtis Leak says in his affidavit that his exchange with Ms. Renckens did not enlighten him about the reporting requirements. Mr. Leak "do[es]n't remember [Ms. Renckens] saying anything about CTRs or any form required by the IRS." J.A. 93. At the time he cashed the check, Mr. Leak "felt I was being hassled because I had a $15,000 check and I was black." J.A. 93. As a consequence, Mr. Leak claims that he "wasn't paying attention and I don't remember what was said because I was so irritated that I was being treated like I was." J.A. 93. In any event, Mr. Leak alleges that when he made the deposits to pay off his mortgage he "neither thought of nor saw any relationship between cashing the $15,000 check and the manner in which I made my deposits." J.A. 93.

The rest of the government's evidence is substantially less compelling. The government does not have any direct evidence that Mrs. Leak knew of the reporting requirements, but it does go to great lengths in discussing her accounting and financial background. Her experience in these areas may have some relevance for the ultimate fact-finder, but there is no evidence that the reporting requirements at issue here were part of her experience. The government also attempts to introduce a wide-ranging collection of evidence through a second affidavit from Agent Toomey. In this second affidavit, however, Agent Toomey makes broad assertions, relying on his personal opinions and information from others unknown. We have serious doubts as to whether these assertions could survive Fed. R. Civ. P. 56(e)'s requirement that summary judgment affidavits "be made on personal knowledge" and be "admissible in evidence."[4] Even if this material

_____

[4] The government claims that "[b]ecause [it] is entitled to use hearsay in a probable cause finding, every affidavit and document which the government has filed is properly in the record." Brief for Appellee at 28. Although hearsay evidence can be used to support a finding of probable cause, the government cannot continue to rely on that evidence in the summary judgment context. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affi-

15

could meet the standards of admissibility, it is not sufficient to support summary judgment. For example, Agent Toomey claims that the Leaks bought a Porsche in 1989 using $13,000 in cash. He also claims that an incomplete Form 8300, which is similar to a CTR, was discovered in the dealership's files under Karen Leak's name. Toomey fails to discuss how he learned of this information; more importantly, he presents no evidence that the Leaks actually knew about the Form 8300 or the requirement to fill one out. Similarly, Toomey says that the Leaks prepared a fraudulent college financial aid form, that the Leaks failed to file tax returns, and that Karen Leak intentionally tried to deceive him about the timing of the filing of certain returns. If submitted in admissible form, this additional evidence might be useful to the ultimate fact-finder as support for the government's theory about the Leaks' motive. However, the evidence is too indirect and underdeveloped, even when combined with the government's other evidence, to show that no genuine issue of material fact remains.

The government contends that our decision in United States v. Wollman, 945 F.2d 79 (4th Cir. 1991), requires summary judgment against the Leaks. In Wollman, however, there was no issue as to the claimants' knowledge of the reporting requirements. The claimants there offered "no evidence suggesting that they did not know of the reporting requirement" and failed to offer any affidavits claiming a lack of knowledge. Wollman, 945 F.2d at 81. In fact, the claimants conceded that a bank teller had informed them of the requirements and that "a motivating factor in their deposit transaction was to avoid entanglement with the IRS." Id. at 81-82. Since the claimants never alleged ignorance of the requirements, there was "no question that the [claimants] knew of the reporting requirements and that they were imposed by the government." Id. at 82. In this case, however, whether the Leaks had knowledge of the requirements is very much in dispute.

_____

davits cannot be conclusory or based on hearsay." (citations omitted)); United States v. 1012 Germantown Road, 963 F.2d 1496, 1501 (11th Cir. 1992) (noting that in a civil forfeiture action "the judge as factfinder [must] sort out the hearsay evidence from the admissible evidence before making a factual determination").

Although we conclude that the government's evidence in this case is insufficient to support summary judgment in light of the Leaks' affidavits, we do not mean to imply that the Leaks could have defeated summary judgment with only the bare, unexplained claim that they were not aware of the reporting requirements. The evidence put forward by a claimant must be "evidence on which the jury could reasonably find for the plaintiff." Anderson , 477 U.S. at 252. In this case, we believe that the Leaks have proffered evidence that, if believed, would enable a rational jury to find by a preponderance of the evidence that they did not have knowledge of the reporting requirements. Mr. Leak claims that he made small deposits in order to protect his personal security. Although the district court may be correct that this method of depositing does not afford the best means of protection, we do not find Mr. Leak's explanation so "incredible" that it can be dismissed out of hand. As the owner of a business (a night club) that generated large sums of cash in a high crime area, Mr. Leak had an important reason to be concerned for his personal security. Mr. Leak believed that his method of making smaller deposits "was the safest thing to do," noting that"in the past, [he had] overheard bank tellers discussing other people's accounts." J.A. 93. Courts have recognized that an individual's attempt to protect his personal security may offer a legitimate explanation for a series of smaller deposits. See Ratzlaf v. United States, 510 U.S. 135, 145 (1994) (noting that individuals may "mak[e] cash deposits in small doses, fearful that the bank's reports would increase the likelihood of burglary"); Dollar Bank, 980 F.2d at 241 (finding that a jury could rationally believe a claimant structured deposits in order to avoid publicity about his wealth that would increase the likelihood of theft). Given the lack of direct proof that the Leaks knew or were informed of the reporting requirements for cash deposits, we cannot say that their explanation lacks so completely in credibility that summary judgment for the government is warranted.**5**

We recognize that the Leaks' complicated series of deposits, along with the testimony of Ms. Renckens, might be sufficient to convince a jury that the Leaks violated 31 U.S.C. § 5324(a)(3). However, we

_____

**5** The Leaks also note that they did not hide what the staggered cash deposits would be used for. Mr. Leak told the bankruptcy trustee he would be paying off the Leaks' mortgage, an act that would obviously require a large amount of cash.

would invade the province of the jury if we were to find that the Leaks' claims of ignorance were too "incredible" to be believed. The district court made such a finding in the course of applying the wrong standard, and it drew the ultimate inference in favor of the government (and against the nonmovants). See J.A. 132 ("Claimant's depositing practices . . . permit the inference that he knew the transaction reporting requirements existed."). In inferring from the underlying circumstances that the Leaks had knowledge of the reporting requirements, the district court completely rejected as unbelievable the Leaks' sworn denials and explanations. The evidence proffered in this case does not permit such a credibility determination at the summary judgment stage. There is a genuine issue of material fact. Accordingly, the award of summary judgment is reversed, and the case is remanded for trial.**6**

REVERSED AND REMANDED

_____

**6** Because we reverse the final judgment of forfeiture as to both of the Leaks, we do not need to reach Mrs. Leak's innocent owner defense or the Leaks' proportionality argument.

18