**UNITED STATES of America, Plaintiff,**

v.

**$206,323.56, MORE OR LESS, IN UNITED STATES CURRENCY, Defendant.**

**Civil Action No. 6:97–0635.**

United States District Court, S.D. West Virginia, Parkersburg Division.

March 23, 1998.

---

Betty A. Pullin, Assistant U.S. Attorney, Charleston, WV, for Plaintiff.

George J. Cosenza, Cosenza & Underwood, Parkersburg, WV, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending are (1) Claimant Jauron D. Hale's motion for summary judgment and (2) Plaintiff's motion for summary judgment and a final order of forfeiture. For reasons that follow, the Court **DENIES** Claimant's and **GRANTS** Plaintiff's motion for summary judgment.

### I.   FACTUAL BACKGROUND

On May 11, 1997 Deputy Brent Gandee of the Wood County Sheriff's Department was on duty, traveling Interstate 77 southbound toward Parkersburg between the Williamstown and Emerson Avenue exits. Observing a black Ford Explorer traveling northbound at a high rate of speed, Gandee activated his radar and discovered the vehicle was traveling 84 miles per hour in a 65 miles per hour zone. The officer crossed the median and signaled the vehicle to pull over, which it promptly did, north of the Williamstown exit but within Wood County, West Virginia.

As Gandee exited his car, he noted there were two occupants in the car. The driver was leaning out his window with his driver's license in hand. Gandee explained he had pulled them over for speeding; the driver, Jauron Dewitt Hale, replied he and his "partner," later identified as Dwight Tuttle, had to go to the bathroom. Hale stated that they were coming from Florida and traveling to Cleveland. Contrary to Hale's statement, Tuttle said that he did not know Hale and that Hale had just picked him up at a rest area a few miles south.

When Gandee asked to see the vehicle registration, Hale replied that the Explorer was his girlfriend's leased vehicle. Hale could not produce the registration, although he looked in the glove compartment, under both the driver's and front passenger's seats and in the back seat. When Hale exited the vehicle to look under the seats, Gandee observed a large bulge, which he believed consistent with a large amount of cash or drugs, in each of Hale's front pockets. Gandee also observed, during Hale's search for the registration, a lot of trash and clothing strewn about the back compartment of the vehicle, which he believed consistent with individuals living in the car for a number of days. Hale was dressed in baggy jeans and a baggy windbreaker. Hale appeared very nervous as he walked around the car to look in various places for the registration. Hale was a much larger man than Gandee.

Gandee became uncomfortable with Hale's continued rooting around the car, Hale's nervous behavior, the inconsistent stories and the fact that Gandee was outnumbered and smaller than Hale. Officer Leland Jefferson of the Williamstown Police Department arrived, after being radioed by the Wood County dispatcher to proceed to the scene. Jefferson observed Hale's nervous behavior (pacing in circles, never standing still, seeming to avoid the issue of finding the registration) and that, because of Hale's size and baggy clothing, it was difficult to tell whether he had any weapons on him.

Gandee asked Hale to place his hands on the hood of the vehicle and patted him down and discovered the pocket bulges resulted from large amounts of cash. Gandee told Hale that he was not under arrest, but that he was handcuffing him for safety reasons

because something appeared amiss. Gandee informed Hale he intended to call for a drug dog to search the car because he believed it contained drugs or illegal weapons. He asked for Hale's consent, to which Hale replied sarcastically that Gandee could "go ahead and get your dog." Gandee Depo. at 35.

Similarly, Gandee asked Tuttle to step out of the vehicle and patted him down. He handcuffed Tuttle and again explained that neither was under arrest but that it was for safety reasons. While Gandee was doing that, he asked Jefferson to place Hale in the back of Gandee's vehicle. As Jefferson was opening the back passenger door, Hale bolted, jumping over the guardrail, down a hill, through a muddy, plowed cornfield and into a swampy area. As Jefferson began pursuit of Hale, Gandee flagged down two cars and asked the occupants to watch over Tuttle, who was handcuffed and in the back of Gandee's vehicle.

Although Hale fell several times, he climbed to his feet and continued his running. Jefferson was eventually able to knock Hale to the ground in the swamp, where he kept him until Gandee helped escort Hale back to the cars. Hale stated that he ran because he had a gun in the car.

At this time, Gandee radioed for a drug dog. During the short wait for the dog, additional backup arrived. The officers took Hale and Tuttle to the station because Hale was wet, cold and muddy, having lost his shoes in the swamp.

Vienna Chief of Police Gary Deem and his drug dog, "Haas," arrived. During a walk around the perimeter of the vehicle, Haas "indicated" several times on the car. Haas strongly alerted on the tailgate portion of the car, at which time Gandee opened the back of the car. Haas jumped into the cargo portion and rooted around in one area, pulling a tote bag out with his teeth. He began pawing at the bag, indicating he smelled drugs in the bag. His pawing was so strong that it partially opened the bag, exposing a large amount of currency in rubber-banded bundles. Gandee fully opened the bag to expose two loaded semi-automatic weapons and a small baggie of what appeared to be marijua-

na. Gandee replaced the zipped-up tote bag in the cargo area and had the Explorer towed back to the station. There, the bag was taken from the vehicle, inventoried and placed in the evidence lockers. It contained rubber-banded bundles of mostly small denominations. The counted money totaled $206,323.56. At the station, Hale offered to Gandee, "Just take the money and let me go," as well as saying the guns, marijuana and money were all his, not Tuttle's. Gandee Depo. at 51–52. Hale was charged with speeding, obstructing and possession of marijuana but the charges were later dropped.

At the station, Tuttle gave a tape-recorded statement to the police that he had known Hale for several months as an acquaintance. Hale had told him that he had been buying drugs in Florida and selling them in Cleveland for the past two and a half years. Tuttle knew Hale was 25 years old and had lots of cash, as well as cars and houses, but did not know Hale to have a job. At Hale's request, Tuttle had accompanied Hale on several trips to Florida to purchase cocaine. Hale told Tuttle he generally paid between $16,000 and $23,000 per kilogram. The first trip in February 1997 had been successful; Hale had purchased 10 kilograms of cocaine for over $160,000. Hale had paid Tuttle $500 for coming along on the trip. Two other trips had been unsuccessful and on one trip, Hale had gotten "ripped off" by the suppliers who had taken his money but not given him the drugs.

Tuttle stated that on this trip, begun on the Thursday before the traffic stop, the supplier had told Hale that he would not have any cocaine available until the following Wednesday. Hale planned to purchase ten kilograms. Because Hale wanted to be in Cleveland for Mother's Day (the day of the traffic stop), they had decided to return to Cleveland and then return to the buy site in a few days. Tuttle stated Hale always brought the tote bag along on the trips. No one but Hale was allowed to touch the tote bag because it contained the cash for the purchase.

On June 13, 1997 Plaintiff filed a verified complaint of forfeiture, seeking forfeiture of

the $206,323.56 found on Hale's person and in the tote bag on the day of the traffic stop. Plaintiff published legal notice of the forfeiture in *The Parkersburg News* and *Parkersburg Sentinel* on June 24, July 1 and July 8, 1997. A default judgment was entered on November 6, 1997 against Tuttle's interest, if any, in the money. No one other than Hale has filed claims for the currency.

## II. DISCUSSION

### A. Seizure of the Res

The forfeiture provision of the Controlled Substances Act, 21 U.S.C. § 881(a)(6),[1] provides for the forfeiture of "[a]ll moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance...." Such items may be seized without a search warrant when "the Attorney General has probable cause to believe that the property is subject to civil forfeiture under this subchapter."[2] *Id.* § 881(b)(4). The Court first addresses Hale's argument that the seizure was illegal under the Fourth Amendment because the officers lacked "probable cause."

The Government argues (1) even if the seizure were illegal, the Fourth Amendment would not require dismissal of the forfeiture action; and (2) the seizure was not illegal. Although our Court of Appeals has not had occasion to address the first issue squarely, the Court believes it would rule in accordance with other circuits holding illegal seizure does not preclude forfeiture. *See, e.g., United States v. $37,780 in U.S. Currency,* 920 F.2d 159 (2d Cir.1990). Alternatively, the Court finds the seizure was not illegal.

■ The Court inquires "'whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Rusher,* 966 F.2d 868, 875 (4th Cir.),

cert. denied, 113 S.Ct. 351, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992) (citations omitted). Here, it is clear Officer Gandee had probable cause to stop Hale's vehicle after determining by radar that the vehicle was greatly exceeding the speed limit. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Although Gandee was not patrolling the interstate for speeders, he was on duty[3] and was able to "lock in" Hale's speed on radar going almost twenty miles per hour above the posted speed limit. Under *Rusher,* in this initial traffic stop, Gandee was justified in requesting Hale's driver's license and vehicle registration, and in directing Hale to search for the registration.

■ During the initial traffic stop, a *Terry* search of the vehicle and the occupants for weapons is permissible "as long as [the officers] possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). During Hale's search, Gandee developed a reasonable belief that Hale was potentially dangerous because of the totality of several factors: a leased vehicle traveling from Florida to Cleveland, a large quantity of clothing and trash strewn in the cargo area (consistent with living out of the vehicle for several days), the large amounts of cash or drugs Gandee believed Hale's pockets held, the inconsistent stories between passengers sitting right next to each other while telling their respective stories, and Hale's size in comparison to Gandee's size. Gandee Depo. at 22–26. "Miami, Florida, is a known source city for narcotics and other illegal drugs," and drug traffickers often rent or lease vehicles for transporting drugs from a source city, *United States v. Thomas,* 913 F.2d 1111, 1115–16 (4th Cir.1990). Keeping in mind that "protection of police and others can justify protective searches when police

1. Plaintiff seeks forfeiture alternatively pursuant to 18 U.S.C. § 981(a)(1) on the grounds the currency was the result of drug trafficking (a specified unlawful activity) and was involved in an attempted financial transaction intended to promote the carrying on of the underlying traffic offenses, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The same analysis applies.

2. In a seizure under this justification, forfeiture proceedings must be instituted promptly. 21 U.S.C. § 881(b).

3. Hale has not questioned Gandee's jurisdiction to stop a speeder.

have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect," *Long*, 463 U.S. at 1049, the Court finds it reasonable for Gandee to conduct a protective search of the passengers for weapons, while advising them they were not under arrest. The temporary use of handcuffs was permissible as well, because of Gandee's reasonable concern for his safety and ability to control the situation. *See United States v. Crittendon*, 883 F.2d 326, 328–29 (4th Cir.1989).

■■■ Hale's attempted escape, leading a chase through hilly, muddy and eventually swampy terrain, and his resistance to capture until Jefferson's third attempt, certainly furnished probable cause, for a further holding of the vehicle for a dog sniff.[4] *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (defining probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place"). *But see United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir.), *cert. denied*, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 342 (1993) (noting that a dog sniff itself is not a search, but that detention of property for a dog sniff does require justification). Once the dog alerted on the tote bag, there was probable cause for the subsequent search. *United States v. Jeffus*, 22 F.3d 554 (4th Cir.1994) ("When the dog "alerted positive" for the presence of drugs, the officer was given probable cause for the search that followed.").

Accordingly, the Court finds there was no violation of the Fourth Amendment in the stop, detention and search of Hale's vehicle.

## B. Forfeiture

■■■ Our Court of Appeals has recently restated the procedure civil forfeiture cases:

[The government] must first show probable cause that the property is liable for forfeiture. In order to meet this burden, it must "*show probable cause that a substan-*

*tial connection exists between the property forfeited and the criminal activity defined by the statute.*" The applicable definition of probable cause "is the same as that which applies elsewhere: 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" Once the government makes the showing of probable cause, "the burden of proof shifts to the claimant to establish, by a preponderance of the evidence, that the property was not used in violation of the law or was not intended to be used unlawfully."

*United States v. Leak*, 123 F.3d 787, 792 (4th Cir.1997) (emphasis added) (internal citations omitted).

"Probable cause" .... requires the court to "make a practical, common-sense decision whether, given all the circumstances set forth ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that the properties to be forfeited are proceeds of illegal drug transactions.

*Thomas*, 913 F.2d at 1114 (citations omitted). The substantial connection test requires that "'[a]t minimum, the property must have more than an incidental or fortuitous connection to criminal activity.'" *United States v. $95,945.18, United States Currency*, 913 F.2d 1106, 1110 (4th Cir.1990) (citation omitted). A direct connection between the property and the illegal activity, however, is not required. *Thomas*, 913 F.2d at 1114.

This Court previously recognized, "Probable cause may also be established by otherwise inadmissible hearsay testimony because the question of probable cause does not depend upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of that evidence." *United States v. Eight Firearms and One Ballast Reflector and Sodium Bulb, Defendants*, 881 F.Supp. 1074, 1077 (S.D.W.Va.1995), *aff'd*, 95 F.3d 42 (4th Cir. 1996).

■■■ When viewed in totality, the facts demonstrate the government has shown

---

4. Although Hale does not argue the stop was too long in duration, the Court notes Hale's memo-

randum itself precludes such an argument. *See* Hale's mem. in supp. summ. judg. at 5.

probable cause that the money has a substantial connection with illegal drug trafficking and is therefore forfeitable. First, several factors present during Gandee's traffic stop of the vehicle lay the foundation: that the vehicle was leased, the passengers driving from Florida to Cleveland, the inconsistency in the stories, Hale's nervousness and Hale's attempted escape. Second, the dog's alerting to the tote bag and the presence of controlled substances inside the tote bag predict Hale's significant involvement with controlled substances.[5] Third, Hale's bag contained only a small amount of marijuana but also two loaded, semi-automatic weapons. It is unlikely that one would need such firepower to protect a small quantity of marijuana. Fourth, most of the money consisted of small denominations bundled with rubber bands. The denominations were consistent with street-level proceeds, as was the rubber-band bundling. Fifth, Hale's comments at the police station of "Just take the money and let me go," suggests he has been in similar situations before. Sixth, Tuttle told the officers (1) Hale was only 25 and had no legitimate source of income but was found with large amounts of cash, (2) Hale's only source of income was drug dealing, (3) the money seized was for the purpose of purchasing 10 kilograms of cocaine, and (4) the intended drug deal was unconsummated but intended for Wednesday following the seizure. This evidence, in its totality, meets the government's burden of demonstrating a sufficient connection and, thus, probable cause.

> With the government having met its burden, the burden now shifts to [the alleged owner] to show that he owned the cash, and that the money was not used in violation of the law or was not intended to be used unlawfully. In responding to the government's motion for summary judgment, *Fed.R.Civ.P.* 56(e) forbids the claimant to "rest upon the mere allegations or denials of the adverse party's pleading." Rather, [the alleged owner] must come forward "with specific facts showing that there is a genuine issue for trial."

*$95,945.18,* 913 F.2d at 1111 (internal citations omitted). Hale offers the explanation that the money was "from employment, winnings from the Ohio Lottery and winnings from legalized gambling," Hale's Resp. to Interrog. 1, Ex. 8, Hale's Mot., but has not provided the Court with any supporting evidence. The Court finds Hale did not rebut the government's showing. *See Thomas,* 913 F.2d at 1118.

Moreover, the Court observes Dwight Tuttle failed to file a claim to the money at issue and the Clerk previously entered Default as to Dwight Tuttle. No verified claims were filed by any person, other than Hale, as required by the terms of the Warrant of Arrest and the Supplemental Rules of Certain Admiralty and Maritime Claims. Any new claim would be time-barred. The United States published a Legal Notice of Forfeiture in *The Parkersburg News* and the *Parkersburg Sentinel* on June 24, 1997, July 1, 1997 and July 8, 1997, as evidenced by the Affidavit of Publication filed with the Clerk of the Court. The United States has complied with the notice provisions of the Supplemental Rules of Certain Admiralty and Maritime Claims.

Accordingly, the Court (1) **DENIES** Hale's motion for summary judgment; (2) **GRANTS** the Plaintiff's motion for summary judgment; and (3) **ORDERS** the following Defendant property is **FORFEITED** to the United States, free and clear of any adverse right, title or interest: $206,325.56, more or less, in United States currency.

---

5. Hale's argument that dog sniffs are unreliable because a large percentage of currency is already contaminated with minute quantities of cocaine ignores that, here, the tote bag contained a controlled substance.